STATE EX REL. Steven PINKERTON,
Relator,

v.

The Honorable Joel P. FAHNESTOCK,
Respondent.

No. SC 94822

Supreme Court of Missouri,
en banc.

Opinion issued October 31, 2017

Pinkerton was represented by Kevin A. Jones and Martin M. Meyers of The Meyers Law Firm LC in Kansas City, (816) 444-8500; and Lee R. Anderson of the Civil Justice Law Firm LLC in Kansas City, (816) 825-2029.

The trade school was represented by Ramsay C. McCullough and Thomas M. Lucas of Jackson Lewis PC in Norfolk, Virginia, (757) 648-1424; and Kyle B. Russell and Lindsey Poling of Jackson Lewis PC in Overland Park, Kansas, (913) 981-1018.

Patricia Breckenridge, Judge

Steven Pinkerton seeks a writ of mandamus or, in the alternative, a writ of prohibition requiring the circuit court to overrule the motion to compel arbitration filed by Aviation Institute of Maintenance (the school). In the alternative, Mr. Pinkerton seeks a writ of mandamus requiring the circuit court to enforce discovery and allow him to file additional opposition to the school's motion to compel arbitration. Mr. Pinkerton contends the circuit court improperly sustained the school's motion to compel arbitration because: (1) the school's incorporation of the delegation provision into the arbitration agreement by reference to the American Arbitration Association's commercial rules was not clear and unmistakable evidence the parties intended to arbitrate threshold questions of arbi-

trability; (2) issues regarding the formation of the arbitration agreement cannot be delegated to an arbitrator; and (3) he specifically challenged the validity and enforceability of the delegation provision.

This Court issued a preliminary writ and now holds the incorporation of the American Arbitration Association (AAA) rules into the arbitration agreement provided clear and unmistakable evidence the parties intended to delegate threshold issues of arbitrability to the arbitrator. Mr. Pinkerton's only specific challenge to the delegation provision—that it would be unconscionable to delegate a determination of unconscionability to a person with a direct financial interest in the outcome— was without merit, and he did not otherwise specifically challenge the validity or enforceability of the delegation provision. Accordingly, the circuit court properly sustained the school's motion to compel arbitration, stayed the case, and ordered the parties to arbitrate threshold issues of arbitrability. The preliminary writ is quashed.

### Factual and Procedural Background

In 2009, Mr. Pinkerton e-mailed the school and requested information about becoming an aircraft technician.[1] In response, Adrian Rothrock, an admissions representative, scheduled an appointment at the school's Kansas City campus. Soon thereafter, Mr. Pinkerton met with Mr. Rothrock and received a tour of the school and a packet of information. A few weeks later, Mr. Pinkerton visited the school for a second time and submitted an application for admission. Four days later, he returned to the school to sign the two-page enrollment agreement for the aviation maintenance technical engineer program.

The enrollment agreement listed information about the program's duration, graduation requirements, tuition and fees, scheduling, and its policies regarding cancellation, termination, withdrawal, and refunds. The enrollment agreement also included an arbitration agreement. The arbitration agreement was about three-fourths from the top of the enrollment agreement's first page. The heading "Arbitration Agreement" was in bold face type, and the terms of the arbitration agreement were in the same type size as the remainder of the enrollment agreement. The arbitration agreement provided:

I agree that any controversy, claim or dispute of any sort arising out of or relating to matters including, but not limited to: student admission, enrollment, financial obligations and status as a student, which cannot be first resolved by way of applicable internal dispute resolution practices and procedures, shall be submitted for arbitration, to be administered by the American Arbitration Association located within Virginia Beach, Virginia, in accordance with its commercial arbitration rules. All fees and expenses of arbitration shall be shared equally and any award rendered in favor of a student will be limited to the total amount paid to the School by the student. Any award or determination rendered by the arbitrator(s) shall be final and entered as a judgment by a court of competent jurisdiction.

Mr. Pinkerton did not receive a copy of the AAA commercial rules.[2]

---

1. The school is the Missouri affiliate of Technical Education Services, Inc., a Virginia-based corporation operating aviation maintenance schools throughout the United States.

2. At the time the parties signed the underlying agreement, the "Commercial Arbitration Rules with Supplementary Procedures for Consumer-Related Disputes" governed consumer arbitration disputes. The "Supplemen-

Rule R-7 of the commercial rules defined the scope of the arbitrator's "jurisdiction." It read, in relevant part:

The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.

Mr. Pinkerton signed the enrollment agreement and received a copy. An admissions representative and another school official also signed the agreement.

On September 28, 2009, Mr. Pinkerton began attending classes. Almost six months later, he requested to switch from the school's 100-week aviation maintenance technical engineer program to a shorter 80-week aviation technician program. The enrollment agreement he signed for the aviation technician program was dated March 24, 2010, and contained a change in the credit hours required for graduation, the cost of books per semester, the total length of the program, and the estimated total student cost per quarter. Otherwise, the enrollment agreement for the aviation technician program included the same information as the enrollment agreement for the aviation maintenance technical engineer program as well as the same arbitration agreement.[3]

In 2011, Mr. Pinkerton graduated from the school as the valedictorian of the night program. Having fulfilled the graduation requirements, he received a certificate of aviation maintenance, which entitled him to take the federal aviation administration examinations to become an airline mechanic. He took both required examinations and received his temporary airman certificate from the federal aviation administration in 2012. Despite having obtained his certification, Mr. Pinkerton alleges he cannot find employment in the aviation field.

In 2014, Mr. Pinkerton filed a lawsuit against the school, Mr. Rothrock, and the school's owner, W. Gerald Yagen, alleging the school engaged in fraud, misrepresentation, and deception related to the school's graduation and job placement rates, starting salaries, and the costs and benefits of its educational programs. The lawsuit included claims for violations of the Missouri Merchandising Practices Act, fraudulent misrepresentation, negligent misrepresentation, money had and received, and unjust enrichment.

The school moved to dismiss, or in the alternative, to compel arbitration and stay the proceedings, citing the arbitration agreement in the enrollment agreement requiring Mr. Pinkerton to arbitrate "any controversy, claim or dispute." The school further contended the arbitration agreement delegated threshold arbitrability disputes, such as whether an arbitration clause is enforceable or its applicability to the dispute at issue, to the arbitrator by incorporating by reference the AAA's jurisdictional rule into the arbitration agreement. The school requested the circuit court enforce this delegation provision if Mr. Pinkerton challenged the arbitration agreement. The school also filed a motion to stay discovery and all other pending pretrial proceedings.

---

tary Procedures for Consumer-Related Disputes" provided that the "AAA's most current rules will be used when the arbitration is started." In 2014, the AAA replaced the "Supplementary Procedures for Consumer-Related Disputes" with "Consumer Arbitration Rules." The consumer rules contain the same jurisdiction clause as the commercial rules.

**3.** Because the two enrollment agreements contained the same arbitration agreement, they will be referred to as the singular "enrollment agreement" throughout the remainder of the opinion.

In response, Mr. Pinkerton filed his preliminary opposition to the school's motion to compel arbitration and the school's motion to stay discovery. Mr. Pinkerton argued the threshold issue of the existence of an enforceable arbitration agreement cannot be delegated to an arbitrator but, instead, is always a decision for the court. He also filed a motion to stay briefing and ruling on the motion to compel arbitration until the parties could conduct discovery related to the arbitration agreement. The circuit court sustained Mr. Pinkerton's motion to stay briefing and ruling on the motion to compel arbitration and allowed the parties 90 days to conduct discovery limited to "the issue of whether an arbitration contract was formed and the scope of any arbitration contract."

The school subsequently renewed its motion to compel arbitration, contending Mr. Pinkerton had not specifically challenged the delegation provision but challenged only the arbitration agreement as a whole. In response, Mr. Pinkerton argued he had challenged the existence of the delegation provision by challenging the existence of any arbitration agreement—including any agreement to delegate issues of arbitrability—in his preliminary opposition. Mr. Pinkerton also contended, for the first time, that the delegation provision was not clearly and unmistakably incorporated into the arbitration agreement, that both the arbitration agreement and the delegation provision lacked consideration, and that the delegation provision was unconscionable.

After conducting a hearing on the matter, the circuit court sustained the school's motion to compel arbitration.[4] The circuit court concluded the delegation provision was enforceable because Mr. Pinkerton did not challenge the delegation provision specifically. The circuit court further held the provision provided for delegation of the gateway question of whether the parties agreed to arbitrate and, therefore, the issue of whether the arbitration agreement was unconscionable is left to the arbitrator per the clear and unmistakable intent of the parties expressed by the incorporation of the AAA rules into the agreement.

Mr. Pinkerton petitions this Court for a writ of mandamus or prohibition, requesting the Court order the circuit court to overrule the school's motion to compel arbitration or, in the alternative, order the circuit court to enforce discovery and allow Mr. Pinkerton to file additional opposition to the school's motion to compel arbitration. This Court issued a preliminary writ of prohibition. Mo. Const. art. V, sec. 4.

## Standard of Review

This Court has the authority to "issue and determine original remedial writs." *Id.* Writs of prohibition or mandamus are appropriate mechanisms to challenge whether a motion to compel arbitration was improperly sustained. *State ex rel. Hewitt v. Kerr*, 461 S.W.3d 798, 805 (Mo. banc 2015); *see also State ex rel. Union Pac. R.R. Co. v. David*, 331 S.W.3d 666, 666 (Mo. banc 2011). This Court reviews *de novo* the legal issue of "[w]hether a valid, enforceable arbitration agreement exists." *Union Pac.*, 331 S.W.3d at 667.

## Analysis

Mr. Pinkerton contends the circuit court erred in sustaining the school's motion to compel arbitration. He asserts the school's incorporation of the AAA commercial rules into the arbitration agreement did not "clearly and unmistakably" express the parties' intent to delegate threshold issues

---

4. In accordance with section 435.355.4, RSMo 2000, the circuit court denied the school's motion to dismiss and held the case was properly stayed.

of arbitrability to an arbitrator. He further contends the circuit court improperly ordered arbitration because only a court, not an arbitrator, can decide whether an arbitration agreement was formed. Lastly, Mr. Pinkerton argues the circuit court erred in finding he did not specifically challenge the delegation provision's validity and enforceability.

### The Delegation Provision

■ The circuit court determined the arbitration agreement contained an enforceable delegation provision delegating issues of arbitrability to the arbitrator. Mr. Pinkerton contends his signature on the enrollment agreement was not evidence he agreed to delegate threshold issues of arbitrability to the arbitrator because the delegation provision was not included as part of the arbitration agreement but was instead incorporated by reference to the AAA commercial rules. Mr. Pinkerton argues that incorporating a delegation provision by reference does not meet the "clear and unmistakable" standard required to show the parties intended an arbitrator to decide issues of arbitrability.

■ Generally, any silence or ambiguity "concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (internal quotation omitted). Issues will, therefore, typically "be deemed arbitrable unless it is clear that the arbitration clause has not included them." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 945, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) (internal quotations omitted). This has been referred to as the "presumption of arbitrability." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 300, 130 S.Ct. 2847, 177 L.Ed.2d 567 (2010).

■ This presumption of arbitrability, however, is reversed when considering whether a court or an arbitrator should decide threshold questions of arbitrability. *First Options*, 514 U.S. at 944-45, 115 S.Ct. 1920. Disputes about arbitrability include those "questions such as whether the parties are bound by a given arbitration clause, or whether an arbitration clause in a concededly binding contract applies to a particular type of controversy." *BG Grp. PLC v. Republic of Arg.*, —— U.S. ——, 134 S.Ct. 1198, 1206, 188 L.Ed.2d 220 (2014) (internal quotations omitted). Disputes over the formation of the parties' arbitration agreement and its enforceability or applicability to the dispute at issue have been considered threshold issues of arbitrability. *Id.* at 1206-07. When considering whether parties have intended to delegate threshold questions of arbitrability to an arbitrator, "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is clea[r] and unmistakabl[e] evidence that they did so." *Rent–A–Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 69 n.1, 130 S.Ct. 2772, 177 L.Ed.2d 403 (2010) (internal quotation omitted) (alteration in original). This "'clear and unmistakable' requirement ... pertains to the parties' manifestation of intent" that issues of arbitrability be decided by the arbitrator instead of the court. *Id.* at 69, 130 S.Ct. 2772 n.1 (emphasis omitted).

The United States Supreme Court has addressed why different standards are necessary when considering "whether a particular merits-related dispute is arbitrable" versus "who (primarily) should decide arbitrability." *First Options*, 514 U.S. at 944-45, 115 S.Ct. 1920 (emphasis omitted). The Supreme Court explained:

> [T]his difference in treatment [between whether a particular merits-related dispute is arbitrable or who (primarily) should decide arbitrability] is understandable. The latter question arises

when the parties have a contract that provides for arbitration of some issues. In such circumstances, the parties likely gave at least some thought to the scope of arbitration. And given the law's permissive policies in respect to arbitration, one can understand why the law would insist upon clarity before concluding that the parties did not want to arbitrate a related matter. On the other hand, the former question—the who (primarily) should decide arbitrability question—is rather arcane. A party often might not focus upon that question or upon the significance of having arbitrators decide the scope of their own powers. And, given the principle that a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration, one can understand why courts might hesitate to interpret silence or ambiguity on the "who should decide arbitrability" point as giving the arbitrators that power, for doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide.

*Id.* at 945 (internal quotations and citations omitted) (emphasis omitted).

Mr. Pinkerton interprets the "clear and unmistakable" standard to prohibit the delegation provision from being incorporated by reference into an arbitration agreement. He contends that no clear and unmistakable evidence exists of the parties' mutual assent to the delegation provision unless the delegation provision is expressly written into an arbitration agreement. Mr. Pinkerton incorrectly assumes that a contract is silent or ambiguous about who should decide arbitrability if the delegation provision is incorporated into an arbitration agreement by reference.

While the Supreme Court has referred to the "clear and unmistakable" standard as a "heightened standard," *First Options* explains it is "heightened" insofar as it is a higher standard than the "presumption of arbitrability" standard applied when interpreting "silence" or "ambiguity" related to the scope of arbitration provisions. *Rent–A–Ctr.*, 561 U.S. at 69 n.1, 130 S.Ct. 2772. The Supreme Court has not held the "clear and unmistakable" standard is heightened in relation to generally applicable principles of contract interpretation.

Interpretation of a written contract is a question of law. *Webbe v. Keel*, 369 S.W.3d 755, 756 (Mo. App. 2012). In Missouri, "the primary rule of contract interpretation is that courts seek to determine the parties' intent and give effect to it." *Chochorowski v. Home Depot U.S.A.*, 404 S.W.3d 220, 226 (Mo. banc 2013). "The intention of the parties is to be gleaned from the four corners of the contract." *L.A.C. ex rel. D.C. v. Ward Parkway Shopping Ctr. Co.*, 75 S.W.3d 247, 260 (Mo. banc 2002). Each clause "must be read in the context of the entire contract, and interpretations that render provisions meaningless should be avoided." *McGuire v. Lindsay*, 496 S.W.3d 599, 607 (Mo. App. 2016). This Court determines the parties' intent as "expressed by the plain and ordinary meaning of the language of the contract." *Chochorowski*, 404 S.W.3d at 226. "When the language of a contract is clear and unambiguous, the intent of the parties will be gathered from the contract alone, and a court will not resort to a construction where the intent of the parties is expressed in clear and unambiguous language." *Id.* at 226-27. "It is only where the contract is ambiguous and not clear that resort to extrinsic evidence is proper to resolve the ambiguity." *J. E. Hathman, Inc. v. Sigma Alpha Epsilon Club*, 491 S.W.2d 261, 264 (Mo. banc 1973).

Missouri further recognizes that "matters incorporated into a contract by reference are as much a part of the contract as if they had been set out in the contract in haec verba." *Dunn Indus. Grp., Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 435 n.5 (Mo. banc 2003). Generally, "[t]erms not explicit in a contract may be incorporated into the contract by reference" so long as the "intent to incorporate [is] clear." *Hewitt*, 461 S.W.3d at 810-11. "To incorporate terms from another document, the contract must make [ ] clear reference to the document and describe[ ] it in such terms that its identity may be ascertained beyond a doubt." *Id.* Parties may, therefore, "incorporate contractual terms by reference to a separate, noncontemporaneous document, including a separate agreement to which they are not parties, including a separate document which is unsigned." *Intertel, Inc. v. Sedgwick Claims Mgmt. Servs., Inc.*, 204 S.W.3d 183, 196 (Mo. App. 2006). There is no requirement that an incorporated document be attached to the contract or provided to the parties prior to the execution of the contract.

Here, the parties' arbitration agreement specifically references the AAA's commercial arbitration rules. At the time Mr. Pinkerton signed the enrollment agreement, the AAA's "Commercial Arbitration Rules with Supplementary Procedures for Consumer-Related Disputes" governed all consumer arbitration disputes. The reference to the AAA's commercial rules in the arbitration agreement was not a mere passing reference to these rules; instead, it was a clear reference to an identifiable, ascertainable set of rules. Such a reference establishes the parties' intent to incorporate the AAA commercial arbitration rules into the enrollment agreement.

This finding is consistent with most federal circuit courts, which have concluded arbitration agreements containing similar language were sufficient to incorporate by reference the delegation provision in the AAA rules. For example, arbitration agreements stating disputes will be "settled by," "conducted by," and "determined by" arbitration "in accordance with" specific rules containing a delegation provision have been held to have "clearly and unmistakably" incorporated the delegation provision into the arbitration agreement. *Brennan v. Opus Bank*, 796 F.3d 1125, 1129 (9th Cir. 2015) ("settled by"); *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 674 (5th Cir. 2012) ("conducted by"); *Fallo v. High—Tech Inst.*, 559 F.3d 874, 877-78 (8th Cir. 2009) ("settled by"); *Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366, 1373 (Fed. Cir. 2006) ("settled by"); *Terminix Int'l Co. v. Palmer Ranch LP*, 432 F.3d 1327, 1332 (11th Cir. 2005) ("conducted"); *Contec Corp. v. Remote Solution Co.*, 398 F.3d 205, 208 (2d Cir. 2005) ("determined by").[5]

5. Only the Tenth Circuit has held an arbitration agreement that specifically referenced the AAA commercial arbitration rules did not clearly and unmistakably delegate "whether an arbitration agreement exists or what the scope of the agreement is" to an arbitrator. *Riley Mfg. Co., Inc. v. Anchor Glass Container Corp.*, 157 F.3d 775, 780 (10th Cir. 1998). *Riley*, however, was decided before *Rent–A–Center* and did not consider whether the AAA commercial arbitration rules were incorporated by reference into the arbitration agreement. Instead, the Tenth Circuit held that, although the arbitration clause in the contract was broadly written, there was "no hint in the text of the clause or elsewhere in the contract that the parties expressed a specific intent to submit to an arbitrator the question whether an agreement to arbitrate exists or remained in existence after the Settlement Agreement." *Id.* at 780. Accordingly, it is unclear whether the parties raised the issue of incorporation of the AAA rules' delegation provision. *See also Quilloin v. Tenet HealthSystem Phila., Inc.*, 673 F.3d 221, 229-30 (3d Cir. 2012) (not discussing whether the contract's incorpo-

The dissenting opinion attempts to differentiate these federal cases on the basis that all but one involved sophisticated parties, not a mere consumer such as Mr. Pinkerton.[6] But in doing so, the dissenting opinion ignores longstanding Missouri contract principles and, instead, advocates for adoption of a standard that would have far-reaching consequences beyond interpretation of arbitration agreements.

■ The dissenting opinion asserts whether Mr. Pinkerton intended to incorporate the AAA rules is a factual question that should be put to the parties' proof. But for purposes of contract interpretation, the intent of the parties is a question of law to be determined from the four corners of the contract. *Whelan Sec. Co. v. Kennebrew*, 379 S.W.3d 835, 846 (Mo. banc 2012). It is only when an ambiguity arises and cannot be resolved within the four corners of the contract that "the parties' intent can be determined by use of parol evidence." *Id.* Only then does the parties' intent become "a factual issue to be resolved by the finder of fact." *Id.*

The dissenting opinion recognizes these principles but contends this Court must look at the "context" of an agreement—including who signed it and the nature of the agreement—to determine ambiguity. More specifically, the dissenting opinion asserts that the unsophisticated nature of a party is key to the determination of ambiguity and that "when a consumer contract purports to incorporate by reference another writing, the court should determine whether the parties actually know and understand the provisions to be included."

■ But the dissenting opinion is mischaracterizing the general proposition that "ambiguity depends on context" to conclude "context" means consideration of the parties' circumstances and whether they actually know and understand the incorporated provision. Such a subjective standard is not what this Court means by considering the "context" of an agreement. Rather, "context" means the reading of the agreement as a whole to determine whether an ambiguity exists. *J. E. Hathman*, 491 S.W.2d at 264; *see also Purcell Tire & Rubber Co., v. Exec. Beechcraft, Inc.*, 59 S.W.3d 505, 510 (Mo. banc 2001) ("Con-

ration of the AAA rules required delegation of threshold issues of arbitrability to an arbitrator).

**6.** The dissenting opinion relies on *50 Plus Pharmacy v. Choice Pharmacy Systems, LLC*, 463 S.W.3d 457 (Mo. App. 2015), and *Dolly v. Concorde Career Colleges, Inc.*, — S.W.3d ——, 2017 WL 4363863 (Mo. App. Oct. 3, 2017), for the proposition that a mere reference to the AAA commercial rules does not establish the parties clearly and unmistakable intended to delegate threshold issues of arbitrability. But *50 Plus Pharmacy* is factually distinguishable in that: (1) the contract at issue specifically stated the parties consented to litigate any disputes arising out of the contract in courts located in Missouri and did not contain an arbitration provision; and (2) although the agreement containing the arbitration agreement was incorporated into the contract by reference, the arbitration agree-

ment related to the narrow topic of escrow claims, which were not at issue in the case. 463 S.W.3d at 461. Moreover, the court of appeals in *Dolly* disregarded the arbitration provision's reference to the AAA rules by reasoning that although "the language in the relevant AAA Rules might be clear and unmistakable, that language is not recited in the agreement signed by the Students." —— S.W.3d at ——, 2017 WL 4363863, at *3. Such an analysis ignores the principle that "matters incorporated into a contract by reference are as much a part of the contract as if they had been set out in the contract in haec verba." *Dunn Indus. Grp.*, 112 S.W.3d at 435 n.5. Accordingly, to the extent *50 Plus Pharmacy* and *Dolly* hold that incorporation by reference of the AAA rules is insufficient to establish the parties intended to delegate threshold issues of arbitrability, they should no longer be followed.

tract language is not interpreted in a vacuum, but by reference to the contract as a whole.").

Furthermore, while the dissenting opinion cites to cases that mention the sophistication of the parties, such cases do not support the subjective "context" standard advocated for by the dissenting opinion. Instead, such cases address specific contract provisions or clauses—such as exculpatory clauses, indemnity clauses, forum selection clauses, and jury trial waivers— that impose additional requirements for a specific provision or clause to be enforceable.

For instance, in addressing exculpatory and indemnity clauses, this Court held limitations or shifts of liability in contracts are enforceable if the exculpatory or indemnity clause contains clear, unambiguous, unmistakable, and conspicuous language. *Alack v. Vic Tanny Intern. of Mo., Inc.*, 923 S.W.3d 330, 337-38 (Mo. banc 1996). In determining the clause's enforceability, this Court did not consider parol evidence as to the parties' subjective intent regarding the clause. Instead, the Court required the clause to include specific terms like " 'negligence' or 'fault' or their equivalents" that would conspicuously shift the liability. *Id.* at 337, 130 S.Ct. 2847. This Court subsequently held that requirement does not govern contracts when the parties are both sophisticated businesses. *Purcell Tire*, 59 S.W.3d at 509. But again, the parties' subjective intent was not examined. This Court simply recognized: "Sophisticated businesses that negotiate at arm's length may limit liability without specifically mentioning 'negligence,' 'fault,' or an equivalent." *Id.* "Sophisticated parties have freedom of contract—even to make a bad bargain, or to relinquish fundamental rights." *Id.* at 508.

Similarly, in *High Life Sales Co. v. Brown–Forman Corp.*, 823 S.W.2d 493,

497 (Mo. banc 1992), this Court adopted the majority rule that forum selection clauses will be enforced, so long as doing so is neither unfair or unreasonable. In considering whether to enforce the forum selection clause, this Court considered whether "the contract was entered into under circumstances that caused it to be adhesive"—that is, a contract "in which the parties have unequal standing in terms of bargaining power." *Id.* There was no consideration of whether the parties subjectively understood the forum selection clause. *Id.* Instead, this Court reasoned "the important factor is that the contract terms were generally arrived at under circumstances that cannot be described as 'adhesive.' " *Id.*

Finally, in *Malan Realty Investors, Inc. v. Harris*, 953 S.W.2d 624, 627 (Mo. banc 1997), this Court held that the parties' waiver of a right to a jury trial must be knowing and voluntary. But in doing so, this Court recognized that "more than contract law is involved." *Id.* And while the Court acknowledged "[t]he real concern with every case decision has been the relative bargaining powers of the parties," the analysis focused primarily on whether the written agreement contained "clear, unambiguous, unmistakable, and conspicuous language" such that a knowing and voluntary waiver of the right to a jury trial was evident. *Id.*

It follows that none of the cases considering the sophistication of the parties addresses arbitration agreements, and each case presents an exception to general principles of contract law. The United States Supreme Court has held arbitration can be limited only by application of principles of general contract law, *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011), so this Court cannot make a rule specifically applicable to arbitration delegation clauses.

 The dissenting opinion also relies on several federal district court cases—all from the Ninth Circuit—and a few state cases. This is because Missouri courts have never considered the sophistication of the contractual parties in determining the parties' intent with respect to arbitration agreements. Rather, Missouri courts apply the longstanding principle that a party's failure to read or understand the terms of a contract is not a defense to enforcement of those terms. *Robinson v. Title Lenders, Inc.*, 364 S.W.3d 505, 509 n.4 (Mo. banc 2012). Missouri contract law, therefore, generally does not support differential treatment for consumers for purposes of contract interpretation.

 Finally, were this Court to adopt the dissenting opinion's approach, its impact would extend beyond interpretation of arbitration agreements. Arbitration agreements are placed "on an equal footing with other contracts, and courts will examine arbitration agreements in the same light as they would examine any contractual agreement." *Triarch Indus., Inc. v. Crabtree*, 158 S.W.3d 772, 776 (Mo. banc 2005). Therefore, this Court would have to consider the parties' sophistication in determining intent in all contracts.

Applying Missouri's general contract principles to this case, Mr. Pinkerton

agreed the AAA commercial arbitration rules, which include a delegation provision, would govern arbitration disputes. By clearly referencing the AAA commercial arbitration rules, the parties expressed their intent to arbitrate any dispute under these rules, including the AAA's "jurisdiction" rule providing that the "[a]rbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." Accordingly, the delegation provision clearly and unmistakably evidences the parties' intent to delegate threshold issues of arbitrability to the arbitrator.[7]

### Enforceability of the Delegation Provision

 Upon finding the parties clearly and unmistakably intended to delegate threshold issues to the arbitrator, the circuit court concluded the delegation provision was enforceable and compelled arbitration. Mr. Pinkerton asserts the circuit court erroneously compelled arbitration because state and federal arbitration law require the circuit court to adjudicate the threshold question of whether an arbitration agreement was formed. But such an argument ignores the nature of his challenges to the arbitration agreement, the severability of the delegation provision,

---

7. The dissenting opinion argues that finding the parties incorporated the AAA commercial arbitration rules by reference conflicts with this Court's analysis in *Hewitt*, 461 S.W.3d at 811. *Hewitt*, however, is factually distinguishable from the present case. In *Hewitt*, an employment agreement contained an arbitration provision that incorporated the NFL's constitution and bylaws, which gave the commissioner complete authority to arbitrate and stated the commissioner shall, from time to time, establish procedures and policies with respect to the constitution and bylaws. *Id.* at 810. The constitution and bylaws did not reference the NFL dispute resolution guidelines. *Id.* Nevertheless, the trial court found the

NFL dispute resolution guidelines governed the arbitration process. *Id.* This Court held the guidelines did not meet the requirements for incorporation by reference because the guidelines were not a separate, non-contemporaneous document described in terms such that their identity could be ascertained beyond a doubt. *Id.* at 811. Unlike the guidelines in *Hewitt*, the AAA commercial arbitration rules were specifically referenced in the enrollment agreement. Because the enrollment agreement specifically identified the rules, which Mr. Pinkerton could have ascertained beyond a doubt, there was no lack of certainty as to the arbitration terms referenced by the enrollment agreement.

and his failure to specifically challenge the enforceability of such provision.

First, Mr. Pinkerton contends threshold issues of the formation of an arbitration agreement cannot be delegated to an arbitrator. Under the Federal Arbitration Act (FAA),[8] arbitration is solely a matter of contract. *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). Accordingly, "arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration." *Id.* Parties "cannot be required to submit to arbitration any dispute which he [or she] has not agreed so to submit." *Id.* (internal quotations omitted). Therefore, because arbitration "is a matter of consent, not coercion," *Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681, 130 S.Ct. 1758, 176 L.Ed.2d 605 (2010), a court must be satisfied that the parties have "concluded" or formed an arbitration agreement before the court may order arbitration to proceed according to the terms of the agreement. *Granite Rock*, 561 U.S. at 299, 130 S.Ct. 2847; *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 n.1, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006). Questions concerning whether an arbitration agreement was ever concluded are, therefore, "generally nonarbitral question[s]." *Granite Rock*, 561 U.S. at 296-97, 130 S.Ct. 2847.

Nevertheless, Mr. Pinkerton does not challenge whether the arbitration agreement was formed or concluded. Instead, Mr. Pinkerton challenges the conscionability of such arbitration agreement. While this Court has held unconscionability is a state law defense to contract formation, *see Brewer v. Mo. Title Loans*, 364 S.W.3d 486, 493 (Mo. banc 2012), conscionability is not an essential element of contract formation. As recognized by the Supreme Court, unconscionability is a "generally applicable contract defense[ ]" like fraud and duress. *Rent–A–Ctr.*, 561 U.S. at 68, 130 S.Ct. 2772. As such, while unconscionability is a defense to contract formation and, therefore, a contract's validity and enforceability, *Eaton v. CMH Homes, Inc.*, 461 S.W.3d 426, 432 (Mo. banc 2015), it is not an issue of whether a contract has ever been "concluded."[9] *See Buckeye*, 546 U.S. at 444 n.1, 126 S.Ct. 1204.

Mr. Pinkerton's mischaracterization of the issue of unconscionability as a formation issue rather than enforceability has no impact on the resolution of this case, however, because both issues of formation and enforceability of arbitration clauses can be delegated to an arbitrator. Mr. Pinkerton does not cite any case law prohibiting issues of formation from being delegated to the arbitrator. Mr. Pinkerton relies on *Baker v. Bristol Care, Inc.*, 450 S.W.3d 770 (Mo. banc 2014), for the proposition that formation issues can never be delegated to an arbitrator. In *Baker*, this Court held a

**8.** Neither party contests that the FAA governs the arbitration agreement in the enrollment agreement. 9 U.S.C. §§ 1-16 (2006). The FAA governs the validity, irrevocability, and enforcement of agreements to arbitrate in contracts "evidencing a transaction involving commerce." 9 U.S.C. § 2. Because the school is a Virginia-based corporation operating aviation maintenance schools throughout the United States, its enrollment agreement with Mr. Pinkerton is a contract falling within the purview of the FAA. 9 U.S.C. § 1 (defining commerce as "commerce among the several States").

**9.** Issues as to whether a contract has been "concluded" include whether: a contract was signed by the obligor, a signor lacked authority to sign a contract to commit a principal, or a signor lacked the mental capacity to sign a contract. *Buckeye*, 546 U.S. at 444 n.1, 126 S.Ct. 1204.

delegation provision that provided the "arbitrator [would] resolve disputes 'relating to the applicability or enforceability' of the agreement" did not delegate issues of contract formation to the arbitrator. *Id.* at 774. *Baker*, however, does not state that issues related to contract formation can never be delegated to an arbitrator but only that the delegation provision at issue in *Baker* was limited to issues of "applicability" or "enforceability." In contrast, the delegation provision at issue here is broader than in *Baker*. It delegates to the arbitrator "the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."

Mr. Pinkerton also cites *Jimenez v. Cintas Corp.*, 475 S.W.3d 679, 683-84 (Mo. App. 2015), *Hopwood v. CitiFinancial, Inc.*, 429 S.W.3d 425, 427 (Mo. App. 2014), and *Bellemere v. Cable–Dahmer Chevrolet, Inc.*, 423 S.W.3d 267, 273 (Mo. App. 2013), for the proposition that courts cannot delegate formation issues to an arbitrator. These cases, however, involved no discussion of a delegation provision and, therefore, are distinguishable from the present case. Consequently, the circuit court did not err in concluding the challenges raised by Mr. Pinkerton could be delegated to an arbitrator.

Mr. Pinkerton further asserts the circuit court erroneously concluded the delegation provision was enforceable. As the circuit court reasoned, however, the delegation provision is a severable, antecedent agreement to arbitrate threshold issues Mr. Pinkerton failed to specifically challenge. ▄▄▄▄ The FAA provides:

A written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and

enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. "The FAA thereby places arbitration agreements on an equal footing with other contracts, and requires courts to enforce them according to their terms." *Rent–A–Ctr.*, 561 U.S. at 67, 130 S.Ct. 2772 (internal citation omitted). But similar to other contracts, arbitration agreements "may be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability." *Id.* at 68, 130 S.Ct. 2772 (internal quotation omitted).

▄▄▄▄ To invalidate an arbitration agreement a specific challenge must be made to the arbitration agreement, not to the contract as a whole. *Ellis v. JF Enters., LLC*, 482 S.W.3d 417, 423-24 (Mo. banc 2016). This "is because § 2 [of the FAA] states that a 'written provision' 'to settle by arbitration a controversy' is 'valid, irrevocable, and enforceable' without mention of the validity of the contract in which it is contained." *Rent–A–Ctr.*, 561 U.S. at 67, 130 S.Ct. 2772 (emphasis omitted). Arbitration agreements, therefore, are severable. *Ellis*, 482 S.W.3d at 419. "This means that they are to be considered separate and apart from any underlying or contemporaneously related agreement." *Id.*

It is under this framework that the Supreme Court determined a delegation provision is an additional, severable agreement to arbitrate threshold issues that is valid and enforceable unless a specific challenge is levied against the delegation provision. *Rent–A–Ctr.*, 561 U.S. at 71, 130 S.Ct. 2772. In *Rent–A–Center*, the defendant sought to compel arbitration. *Id.* at 65, 130 S.Ct. 2772. The plaintiff asserted the arbitration agreement, as a whole, was unenforceable because it was unconscionable under state law. *Id.* at 66, 130 S.Ct.

2772. In finding the controversy was subject to arbitration, the Supreme Court focused on the delegation provision. *Id.* at 68-69, 130 S.Ct. 2772. The Supreme Court explained: "The delegation provision is an agreement to arbitrate threshold issues concerning the arbitration agreement." *Id.* at 68, 130 S.Ct. 2772. "An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the ... court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Id.* at 70, 130 S.Ct. 2772. Such delegation provisions are valid under section 2 of the FAA "save upon such grounds as exist at law or in equity for the revocation of any contract." *Id.* (internal quotation omitted). Therefore, unless the plaintiff "challenged the delegation provision specifically, [the Supreme Court] must treat it as valid under § 2, and must enforce it under §§ 3 and 4, leaving any challenge to the validity of the [a]greement as a whole for the arbitrator." *Id.* at 72, 130 S.Ct. 2772. The Supreme Court then concluded the defendant was seeking to enforce the delegation provision and the plaintiff challenged the arbitration agreement as a whole and not the delegation provision specifically. *Id.* The delegation provision, therefore, was enforceable, and the gateway issues of arbitrability were delegated to the arbitrator. *Id.*

Similarly, in seeking to compel arbitration, the school sought enforcement of the incorporated delegation provision. The delegation provision, as an additional, antecedent agreement to arbitrate threshold issues, is valid and enforceable under the FAA unless specifically challenged by Mr. Pinkerton.

The only specific challenge Mr. Pinkerton raised before the circuit court as to the enforceability of the delegation provision was his contention the delegation provision was unconscionable on the sole ground that "[i]t would be unconscionable to delegate such a determination [of unconscionability] to a person with a direct financial interest in the outcome." Such a contention, however, is defeated by the Supreme Court's holding in *Rent–A–Center* that issues of unconscionability can be delegated to an arbitrator. 561 U.S. at 73-74, 130 S.Ct. 2772. Mr. Pinkerton's challenge to the delegation provision, therefore, is without merit.

Although Mr. Pinkerton now claims, on appeal, he raised other challenges to the validity or enforcement of the delegation clause separate from his challenges to the arbitration agreement as a whole, he did not. Mr. Pinkerton's various challenges were to the arbitration agreement as a whole. For example, Mr. Pinkerton asserted "there was no meeting of the minds as to the arbitration clause" because "its terms are incomprehensible." Mr. Pinkerton also asserted the "print of the arbitration clause is too small as to be virtually unreadable" and the "arbitration clause is, both on its face and in practice, a model of unconscionability." While a party may challenge a delegation provision by arguing "common procedures as applied to the delegation provision rendered that provision unconscionable," *id.* at 74, 130 S.Ct. 2772 (emphasis omitted), Mr. Pinkerton did not direct his challenges specifically to the delegation provision. Instead, he argued the "incomprehensible" terms and the print rendered the entire arbitration clause invalid and the entire arbitration clause was unconscionable. These are challenges to the arbitration agreement as a whole, not to the delegation provision specifically.

Additionally, Mr. Pinkerton asserts the arbitration agreement is unconscionable because the "clause purports to require the parties to share arbitration expenses

equally, in contravention of even the AAA's own express rules requiring the business in any consumer dispute . . . to bear substantially all arbitration costs." Mr. Pinkerton contends this conflict between the fee sharing provision in the arbitration agreement and the AAA's rules makes the entire "clause" unconscionable. This too is not a specific challenge to the delegation provision.[10]

Mr. Pinkerton also asserts the arbitration clause "facially and in practice unilaterally imposes arbitration on only one party—the student" and "no student has ever . . . been allowed to opt out of the arbitration provision." Because both the school and Mr. Pinkerton are required to submit threshold questions of arbitrability to the arbitrator, these challenges could only refer to the arbitration provision defining the scope of arbitrable claims. Likewise, Mr. Pinkerton contended that this "arbitration clause is facially incomprehensible as to what claims would be covered by it" and, specifically, whether "the arbitration clause . . . applies to a claim by a student against [the school] for fraud." Again, such

contentions apply only to the arbitration provision that defines the scope of claims that are arbitrable. Similarly, Mr. Pinkerton's contention that "the clause purports to limit students' remedies" also refers only to the arbitration of specific disputes arising out of "student admission, enrollment, financial obligations and status as a student" and not the arbitration of threshold issues of arbitrability. Accordingly, none of these challenges are directed specifically to the delegation provision.[11]

■ Although Mr. Pinkerton challenges the validity of the arbitration agreement as a whole, his only specific challenge to the delegation agreement—that it was unconscionable to delegate formation issues to an arbitrator—is without merit, and he did not otherwise direct any specific challenges to the delegation provision.[12] This Court must, therefore, treat the delegation provision "as valid under § 2 [of the FAA], and must enforce it under §§ 3 and 4, leaving any challenge to the validity of the [a]greement as a whole," or to other provisions within the arbitration agree-

---

**10.** Moreover, Mr. Pinkerton did not raise this specific challenge in his pleadings before the circuit court. In his opposition to the defendants' motion to stay the circuit court's September 8 order, Mr. Pinkerton lists the general factors of unconscionability, stating: "Each of these factors supports a finding of unconscionability with regard to the arbitration agreements and delegation provisions utilized by Defendants in their Enrollment Agreements." No specific challenge to the fee sharing provision of the arbitration agreement was made in his pleadings before the circuit court. *See* Rule 84.13(a).

**11.** In his brief before this Court, Mr. Pinkerton also references arguments from his reply in support of his motion to stay briefing and his sur-reply in opposition to the defendants' motion to stay discovery. The circuit court overruled Mr. Pinkerton's motion for leave to file these documents; therefore, these arguments were not before the circuit court. Fol-

lowing the school's renewed motion to compel arbitration, Mr. Pinkerton filed opposition to the school's motion and had an opportunity to raise these additional arguments in the circuit court.

**12.** The dissenting opinion contends the record clearly shows Mr. Pinkerton specifically challenged the delegation provision and points to a motion he filed stating in capital letters that he "disputes the existence and enforceability of any agreement to delegate issues of arbitrability to an arbitrator." What the dissenting opinion ignores is that Mr. Pinkerton then proceeded to challenge the arbitration agreement as a whole. Again, a delegation provision is a severable agreement that is enforceable unless a specific challenge is levied against the provision. *Rent–A–Ctr.*, 561 U.S. at 71, 130 S.Ct. 2772. Therefore, despite his contentions to the contrary, Mr. Pinkerton failed to levy a direct challenge to the delegation provision.

ment, "for the arbitrator." *Id.* at 72. The circuit court, therefore, did not err in ordering the parties to arbitrate threshold issues of arbitrability. The preliminary writ of prohibition is quashed, and the case shall proceed to arbitration.

## Conclusion

The arbitration agreement clearly and unmistakably evidences the parties' intent to delegate threshold issues of arbitrability to the arbitrator. Because Mr. Pinkerton's only specific challenge to the delegation provision—that it would be unconscionable to delegate a determination of unconscionability to a person with a direct financial interest in the outcome—is without merit, the delegation provision is valid and enforceable under the FAA. The circuit court, therefore, properly sustained the school's motion to compel arbitration, staying the case and ordering the parties to proceed to arbitration. The preliminary writ is quashed.[13]

Fischer, C.J., Wilson and Russell, JJ., concur;

Stith, J., dissents in separate opinion filed;

Draper, J., concurs in opinion of Stith, J.

Powell, J., not participating.

Laura Denvir Stith, Judge, dissenting.

I dissent.

The United States Supreme Court has held, "When deciding whether the parties agreed to arbitrate a certain matter (in-cluding arbitrability), courts generally ... should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995).* But the Supreme Court added an important qualification "applicable when courts decide whether a party has agreed that arbitrators should decide arbitrability: Courts should not assume that the parties agreed to arbitrate arbitrability *unless there is 'clea[r] and unmistakabl[e]' evidence* that they did so." *Id.* (emphasis added); *accord Rent–A–Ctr., W., Inc. v. Jackson, 561 U.S. 63, 68, 130 S.Ct. 2772, 177 L.Ed.2d 403 (2010).* Therefore, the record must provide "clear and unmistakable" evidence the parties intended to delegate questions of arbitrability to the arbitrator.

The majority fails to give meaning to this high standard of proof when it holds "clear and unmistakable" evidence of such intent is irrebuttably provided based solely on the fact Mr. Pinkerton signed a contract referencing the American Arbitration Association's rules of arbitration and one of the unattached commercial AAA rules at that time delegated issues of arbitrability to an arbitrator. Regardless of whether this is a valid conclusion for commercial or sophisticated parties—as numerous federal courts have held—Mr. Pinkerton undeniably is an unsophisticated consumer, and only one of the cases on which the majority relies involved an unsophisticated party.

Despite the majority's refusal to so recognize, Missouri historically has required greater specificity and protection for con-

---

**13.** In the alternative, Mr. Pinkerton seeks a writ of mandamus requiring the circuit court to enforce discovery and allow him to file additional opposition to the school's motion to compel arbitration. In support of his alternative theory, Mr. Pinkerton asserts: "If this Court finds the record is not yet sufficient to deny the motions to compel arbitration, [he] should be afforded the remainder of the arbitration-related discovery he seeks, and an opportunity to adduce all the relevant evidence and his arguments." Because this Court does not find the record to be insufficient, this Court rejects Mr. Pinkerton's alternative grounds for a writ of mandamus.

sumer contracts purporting to waive the consumer's litigation rights—including the right to jury trial, forum selection clauses, and waiver of negligence clauses—than it has for such provisions in a contract between sophisticated parties. Rather than presuming the consumer understands the contract, the courts look to the record to determine whether the waiver is valid on a case-by-case basis.

Applying these principles here, it is error to find the contract's mere incorporation of the unattached and undescribed AAA rules would have unambiguously signaled to an unsophisticated consumer that an arbitrator rather than a judge would determine whether the arbitration provision itself was valid. The contract's reference to the AAA rules is but one fact among many the courts must consider in determining the factual issue of whether the parties "clearly and unmistakably" intended to delegate the arbitrability issue to the arbitrator.

## I. THE CONTRACT DID NOT UNAMBIGUOUSLY DELEGATE THE ISSUE OF CONTRACT FORMATION TO THE ARBITRATOR

I agree with the majority that the intention of the parties as to the meaning of a contract becomes a factual issue requiring a court to resort to parol evidence only when an ambiguity arises and "cannot be resolved within the four corners of the contract." *Whelan Sec. Co. v. Kennebrew*, 379 S.W.3d 835, 846 (Mo. banc 2012). When the contract is ambiguous, however, the law is well-settled that the issue of intent is a factual question as to which parol evidence is admissible. *Id.*

While Missouri law provides that matters incorporated by reference into a contract "are as much a part of the contract as if they had been set out in the contract," *Dunn Indus. Grp., Inc. v. City of Sugar*

*Creek*, 112 S.W.3d 421, 435 n.5 (Mo. banc 2003) (citations omitted), Missouri law also is well-settled that "[m]ere reference" to another agreement in the primary contract "is insufficient to establish that [a party] bound itself to the" other agreement, *id. at 436*. The party must specifically incorporate by reference the secondary agreement to be bound to it by contract principles. *Id. at 436 n.5*. Parties can incorporate a separate document only if "the contract makes clear reference to the document and describes it in such terms that its identity may be ascertained beyond doubt." *Intertel, Inc. v. Sedgwick Claims Mgmt. Servs., Inc.*, 204 S.W.3d 183, 196 (Mo. App. 2006).

This Court recently applied these rules in the arbitration context in *State ex rel. Hewitt v. Kerr*, 461 S.W.3d 798, 811 (Mo. banc 2015). *Hewitt* held a vague or indefinite incorporation by reference of arbitration rules may make the contract ambiguous, and in such a case the contract will be construed against the drafter. *Id.* In *Hewitt*, the employment contract said it incorporated "Rules and Regulations of the National Football League." *Id. at 803*. Those rules in turn incorporated arbitration guidelines of the NFL. *Id. at 804*. This Court concluded the guidelines nonetheless were not binding on Mr. Hewitt because the "guidelines were not referenced in Mr. Hewitt's employment contract, nor were they clearly referenced in the constitution and bylaws. ... Th[e contract] reference does not identify the guidelines in such a way that Mr. Hewitt could ascertain them beyond doubt." *Id. at 811*. *Hewitt* continued:

> At best, under the terms of the constitution and bylaws, Mr. Hewitt agreed to arbitrate by undefined terms that the commissioner would establish. But these terms also lack certainty; Mr. Hewitt had no way to identify these terms and had no way to know that the NFL in-

tended the guidelines to govern arbitration proceedings. *Given the ambiguity of any .terms actually referenced, Mr. Hewitt could not assent to them.*

*Moreover, Mr. Hewitt did not bear the burden .to seek out an unknown document not clearly identified in his employment contract or the constitution and bylaws.* Though· the NFL and the Rams may have intended to incorporate the guidelines into the constitution and bylaws and the employment. contract, respectively, it is a well-settled rule that "[i]f ambiguous, [a contract] will be construed against the drafter." *Triarch Indus.,. Inc. v. Crabtree,* 158 S.W.3d 772, 776 (Mo. banc 2005). *The Rams had the burden to incorporate the terms in such a way that Mr. Hewitt could manifest his consent. Having failed to do so, Mr. Hewitt did not assent to the essential terms of arbitration found in the guidelines.*

*Id.* (emphasis added).

While the majority says that no Missouri arbitration case ·has looked at the context of an agreement to arbitrate in determining its ambiguity, *Hewitt* did just that. In determining whether the contract was ambiguous, *Hewitt* did not merely note that the. Rams contract said it incorporated another matter and conclude this fact alone unambiguously made the incorporated matter a part of the contract. Instead, it looked at the terms, looked at the rules incorporated, determined the incorporated rules were not clear as to where to find the guidelines they in· turn incorporated, and determined the contract, therefore, was ambiguous and must be interpreted against the drafter. *Id.*

Even more directly on point is *50 Plus Pharmacy v. ·Choice Pharmacy Systems, LLC, 463 S.W.3d 457 ·(Mo. App. 2015).* Missouri law long has provided, "Whether a dispute is covered by an arbitration clause is relegated to the courts as·a matter of law and is to be determined from the contract .entered. into. by the parties." *Greenwood v. Sherfield, 895 S.W.2d 169, 174 (Mo. App. 1995).* .50 Plus· Pharmacy recognized "there . is a significant · difference between the question of ·*who* should decide arbitrability versus *whether* arbitration should be compelled." 463 S.W.3d at 460. While "the latter question . ∴ . operates under a [presumption of arbitrability], the former . . . operates under a principle· wherein the law reverses · the presump÷ tion." *Id.* (citations omitted). In Missouri, therefore, "unless the parties clearly and unmistakably provide otherwise, the question ·of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator:" *Id.* at 461 (citations omitted).

The Missouri .Court of Appeals recently followed *50 Plus Pharmacy* in *Dolly v. Concorde Career Colleges, Inc.,* — S.W.3d —, —, *2017 WL 4363863, at \*3 (Mo. App.· Oct. 3, 2017). Dolly* involved a dispute over an arbitration provision in an enrollment agreement between a small. college and its students. *Id. at* —, *at \*1.* The enrollment . agreement incorporated .the AAA. rules by .reference, and the college argued this was sufficient evidence of the parties' intent to delegate arbitrability of their dispute to the arbitrator. *Id. at* —, *at ·\*2.* The appellate court disagreed, however, noting, "While .parties may. agree to . arbitrate ... . questions of arbitrability . . . that would normally be for the court[,] there must be clear and unmistakable evidence of such [an] agreement." *Id.* (internal· quotations omitted). The appellate court specified that, "While the language in the. relevant AAA Rules ·might be clear and unmistakable, that language is not recited. in the agreement signed by the Students" and a "general reference to the AAA Rules in an arbitration provision is

not sufficient to establish an agreement to delegate [arbitrability]." *Id. at* ——, *at \*3*.

The question of who the parties are and what parties in their situation would understand the contract to mean also has been recognized by other states in determining whether a delegation clause in an arbitration agreement is ambiguous. As the Supreme Court of Kentucky noted in *Dixon v. Daymar Colleges Group, LLC, 483 S.W.3d 332 (Ky. 2015)*, "when a party raises a good-faith [formation] challenge to [an] arbitration agreement itself, that issue must be resolved before a court can say that [the party] clearly and unmistakably intended to *arbitrate* that very validity question." *Id. at 342, quoting, Rent–A–Center, 561 U.S. at 82, 130 S.Ct. 2772* (Stevens, J., dissenting). In *Dixon*, a group of students argued an arbitration provision was not binding on them "because their signature was physically inscribed before the arbitration provision . . . itself." *Id.*

While *Dixon* conceded "the delegation provision was clear," it noted "the language of the delegation provision is largely beside the point." *Id.* Instead, the decision confirmed "a trial court is tasked with determining whether there exists a 'valid, binding arbitration agreement' before it may order a case to arbitration." *Id. at 341, quoting, JPMorgan Chase Bank, N.A. v. Bluegrass Powerboats, 424 S.W.3d 902, 907 (Ky. 2014)*. *Dixon* found language that incorporated subsequent amendments inadequate to include the arbitration provision after the signature line on the reverse side of the page. *483 S.W.3d at 346; see also Walker v. Builddirect.Com Techs. Inc., 349 P.3d 549, 551 (Okla. 2015)* (reciting general incorporation rules requiring "a contract must make clear reference to the extrinsic document to be incorporated, describe it in such terms that its identity and location may be ascertained beyond doubt, and the parties to the agreement

[must have] had knowledge of and assented to the incorporated provisions").

The majority does not formally disagree with these principles. But these principles are inconsistent with the majority's determination that the mere incorporation of AAA rules is inherently unambiguous. To so hold is error. The majority is required to look at the contract as a whole, including who signed it and the nature of the contract, and of the matters incorporated, before it can determine whether incorporation of the AAA rules "clearly and unmistakably" informed an unsophisticated party such as Mr. Pinkerton that he was delegating to an arbitrator the right to determine the validity of the arbitration clause itself.

In particular, the majority is required to consider the fact that this is a contract between a sophisticated business entity and a consumer. The majority suggests Missouri law just does not allow it to consider this fact unless it first finds the contract ambiguous, even though it is consideration of the unsophisticated nature of the plaintiff that is key to the determination of ambiguity in the first instance. Indeed, the majority even concedes Missouri does consider the sophistication of the parties when considering the validity of a waiver of the right to sue the other party for their own negligence. But, it says, that is an isolated exception, not relevant here. The majority is wrong on all counts.

Many Missouri cases, addressing a wide variety of issues and in a myriad of contexts, have stated that the sophistication of the parties properly is considered in determining an agreement's meaning and validity. These cases are part of a long history of Missouri cases recognizing that cases involving the giving up by an unsophisticated party of a litigation right requires more exacting scrutiny and consideration of the unsophisticated nature of the signer

in determining whether a contract is unambiguous.

*50 Plus Pharmacy* specifically recognized "a general reference to 'the then Existing Commercial Arbitration Rules of the American Arbitration Association['] ... [is] not the sort [of express delegation] addressed or contemplated by the *Rent–A–Center* court as dictating delegation of the gateway matter of the question of arbitrability to the arbitrator." *463 S.W.3d at 461.* This is, of course, the very question at issue in this case, and the same result should be reached. Similarly, *Dolly* held mere reference to the AAA rules "does not constitute 'clear and unmistakable' evidence of delegation to an arbitrator of disputes relating to formation and enforceability of the arbitration provision." ——— *S.W.3d at* ———, *2017 WL 4363863, at \*3.*

Perhaps the most well-known decision about whether the sophistication of the party determines the validity of the waiver is *Purcell Tire & Rubber Co. v. Executive Beechcraft, Inc., 59 S.W.3d 505 (Mo. banc 2001).* This Court was tasked with determining whether an ambiguity existed in a contract between two "sophisticated businesses, experienced in th[e] type of transaction." *Id. at 510-11.* In holding there was no ambiguity in the liability waiver at issue, this Court specifically held "*[a]mbiguity depends on context*" and "*[l]anguage that is ambiguous to an unsophisticated party may not be ambiguous to a sophisticated commercial entity.*" *Id. at 510,* citing, *Alack v. Vic Tanny Int'l of Mo., Inc., 923 S.W.2d 330, 338 n.4 (Mo. banc 1996)* (emphasis added). It was only because of the contract's "commercial context," that *Purcell* held there was no ambiguity, repeatedly citing the fact the parties were "sophisticated businesses" in each instance. *59 S.W.3d at 509-11.*

The majority incorrectly suggests these cases have no application here and just mean more specific language must be used in to waive the seller's negligence. This misses the point. The reason more specific language must be used is that an unsophisticated purchaser would not understand the more general language was intended to waive negligence unless that fact were spelled out in the contract. The analogy is exact. Unsophisticated persons such as Mr. Pinkerton would not understand that incorporation of the AAA rules meant that an arbitrator would decide issues of arbitrability unless that fact were spelled out in the contract.

Moreover, *Purcell's* recognition of the importance of whether a party is sophisticated is not, as the majority would suggest, an isolated instance. The principle the majority adopts—that a provision that would be clear to a sophisticated party may not be clear to an unsophisticated one—has been applied time and again to attempts to get an unsophisticated consumer to contract to waive the right to sue for negligence.[1] Furthermore, the principle

---

1. In addition to *Purcell*, numerous other Missouri cases have followed the same rationale in the context of liability waivers. *See Village of Big Lake v. BNSF Ry. Co., 433 S.W.3d 460, 468 (Mo. App. 2014)* ("It is [] clear that a different standard applies to determine whether general exculpatory clauses or indemnity clauses can cover claims of future negligence depending on whether the parties to the contract are sophisticated businesses, experienced in this type of transaction.") (citations omitted); *National Info. Solutions, Inc. v. Cord Moving & Storage Co., 475 S.W.3d 690, 692 (Mo. App. 2015)* ("In general, for a party to effectively release itself from or limit liability for its own negligence, the language of the contract must be clear, unequivocal, conspicuous and include the word 'negligence' or its equivalent. But less precise language may be effective when the contract is negotiated at arm's-length between equally sophisticated commercial entities.") (citations omitted); *Lone Star Indus., Inc. v. Howell Trucking, Inc., 199 S.W.3d 900, 903 n.2 (Mo. App. 2006)*

on which these cases are founded—that "ambiguity depends on context" and the sophistication of the parties—was stated by *Purcell* as a general concept, and this Court has recognized it as such. For example, *Utility Service & Maintenance, Inc. v. Noranda Aluminum, Inc., 163 S.W.3d 910, 913 (Mo. banc 2005)*, a case involving an indemnity provision in a contract between two "sophisticated commercial entities," said Missouri "has [and continues to] draw[ ] a distinction between contracts with consumers and contracts between businesses of equal power and sophistication." *Id., citing, Alack, 923 S.W.2d at 338 n.4.*

Similarly, numerous other Missouri cases have applied the principle that ambiguity depends on context and the sophistication of the consumer to other types of contract provisions that attempt to limit an unsophisticated party's rights. Importantly, this Court applied these principles to a contract purporting to waive the right to jury trial in *Malan Realty Investors, Inc. v. Harris, 953 S.W.2d 624 (Mo. banc 1997)*, stating the fundamental right to "a jury trial may be waived by contract. . . . However . . . [there is a] real concern [in such situations regarding] the relative bargaining powers of the parties." *Id. at 627.* To determine the validity of a jury trial waiver, *Malan* took into account several factors, including the "disparity in bargaining power between the parties [and] the business acumen of the party opposing the waiver." *Id.*

Various federal courts similarly have applied *Purcell*'s analysis and principles, considering the sophistication of the parties in deciding whether fundamental rights may be contractually waived. *See, e.g., Lift Truck Lease & Serv., Inc. v. Nissan Forklift Corp., N. Am., 2013 WL 3092115, at *2 (E.D. Mo. June 18, 2013)* ("In Missouri, sophisticated parties may contract to relinquish fundamental rights[.]"); *Sports Capital Holdings (St. Louis), LLC v. Schindler Elevator Corp. & Kone, 2014 WL 1400159, at *2 (E.D. Mo. Apr. 10, 2014)* (involving a dispute over an elevator maintenance contract and noting, "It is well-settled in Missouri that '[s]ophisticated parties have freedom of contract—even to make a bad bargain, or to relinquish fundamental rights' ").

This Court has recognized the importance of the sophistication of the parties in considering the validity of a forum selection clause as well. In *High Life Sales Co. v. Brown–Forman Corp., 823 S.W.2d 493 (Mo. banc 1992)*, this Court noted, "Many courts have refused to enforce a forum selection clause on the grounds of unfairness if the contract was entered into under circumstances that caused it to be adhesive." *Id. at 497* (citations omitted). Based on this premise, this Court held the forum

---

("[C]ourts have drawn a distinction between contracts with consumers and contracts between businesses of equal power and sophistication."); *Caballero v. Stafford, 202 S.W.3d 683, 696 n.2 (Mo. App. 2006)* ("We do not ignore the principal [sic] that less precise language may be effective in agreements negotiated at arms length between equally sophisticated commercial entities."); *Milligan v. Chesterfield Vill. GP, LLC, 239 S.W.3d 613, 616 n.3 (Mo. App. 2007)* ("Sophisticated businesses that negotiate at arm's length may limit liability without specifically mentioning 'negligence,' 'fault,' or an equivalent."); *Eas-*

*ley v. Gray Wolf Invs., LLC, 340 S.W.3d 269, 273 (Mo. App. 2011)* (finding it "significant[ ]" that "the evidence established that [Appellant] was a relatively sophisticated party contracting at arm's length with [Respondent]"); *Monsanto Co. v. Gould Elecs., Inc., 965 S.W.2d 314, 316-17 (Mo. App. 1998)* ("Here, [Respondent] and [Appellant] are sophisticated commercial entities. [Respondent] agreed to indemnify [Appellant] from 'any and all liabilities. . . .' Such terms clearly and unequivocally provide for [Respondent] to indemnify [Appellant] against any and all claims.").

selection agreement "was not unfair [because] it was between two substantial and successful companies, drafted and agreed upon by their respective counsel following give-and-take negotiations on various provisions." *Id.*

Missouri cases similarly have considered the sophistication of the parties in determining the validity of the terms of a lease waiver provision in *Halls Ferry Investments, Inc. v. Smith, 985 S.W.2d 848, 853 (Mo. App. 1998)*, stating, "While the lease failed to state that no such obligation existed, an ambiguity cannot be created by silence, especially when both parties are sophisticated bargainers." Likewise, Missouri courts have "long ... held that an ambiguity [in a contract generally] cannot be created by silence, especially when both parties are sophisticated bargainers." *Morelock–Ross Properties, Inc. v. English Vill. Not-for-Profit Sewer Corp., 308 S.W.3d 275, 280 (Mo. App. 2010)* (determining a contract for sewage collection services between sophisticated parties could not be rendered ambiguous on the grounds it failed to expressly mention how certain fees should be collected) (citations and quotations omitted).

These cases are not merely "exceptions" that can be ignored in determining the meaning of the arbitration clause. They are the rule in cases involving the validity under Missouri law of a waiver of rights by an unsophisticated consumer. When dealing with a contract in which the parties have such unequal bargaining power, the principle set out in *Purcell* that "ambiguity depends on context" and the sophistication of the party is not an exception to the general rule regarding interpretation, applicable (for some unexplained reason) only in the case of waivers of the right to sue for negligence. Indeed, it would make no sense to allow consideration of a party's sophistication in that context but no other.

Rather, these are established principles of Missouri contract law, applicable to the many kinds of waivers of litigation rights contained in contracts between sophisticated and unsophisticated parties.

For these reasons, when, as here, the issue is the validity of an unsophisticated consumer's waiver of litigation rights, Missouri's consistent rule has been to consider the lack of sophistication of one of the parties in determining how that party would interpret the waiver. This is the only way to treat an arbitration clause the same as other contract clauses are treated under Missouri law, which the majority concedes is required by the Federal Arbitration Act (FAA). The waiver of the right to have a judge determine the issue of arbitrability, like the a waiver of the right to sue for negligence, the right to jury trial, and the right to select one's forum, should be considered "in context" and in light of the relative sophistication of the parties. Indeed, it must be considered in the same way as are other comparable contractual waivers in Missouri. *See Rent–A-Ctr., 561 U.S. at 68, 130 S.Ct. 2772; Brewer v. Mo. Title Loans, 364 S.W.3d 486, 497 (Mo. banc 2012)* (arbitration provisions are required to be treated the same as, and subject to the same defenses as, other contract provisions).

The majority does not cite any contrary Missouri cases. Instead, it relies on a number of United States court of appeals cases. While most of those cases do hold incorporation of the AAA rules unambiguously waives the right to have a court determine arbitrability, those cases do not govern here for numerous reasons.

First, the FAA leaves the question of who should decide contract formation issues to the parties to determine by contract; it does not require that these issues be delegated to the arbitrator. Second, as noted earlier, the FAA requires arbitration

clauses be treated the same as other comparable contract provisions in the state. *Rent–A–Ctr.*, 561 U.S. at 68-69, 130 S.Ct. 2772. In this case, that means the arbitration clause should be governed by the same principles of incorporation by reference, context, and the sophistication of the consumer as are other contractual waiver provisions, for these are general principles of Missouri contract law. For that reason, it does not matter if under federal law the AAA incorporation provision would be considered unambiguous; this is a matter of state law. *See State v. Storey*, 901 S.W.2d 886, 900 (Mo. banc 1995) (federal interpretation of Missouri law is not binding on Missouri courts); *Brewer*, 364 S.W.3d at 492 ("[Federal law] permits state courts to apply state law defenses to the formation for the particular contract at issue on a case-by-case basis.").

Third, and even more importantly, all of the federal cases addressing delegation of the arbitrability issue by incorporation of the AAA rules except *Fallo v. High–Tech Institute*, 559 F.3d 874 (8th Cir. 2009), involve a sophisticated business entity or executive.[2] As noted in *Brennan v. Opus Bank*, 796 F.3d 1125, 1130-31 (9th Cir. 2015), the rest of these federal cases simply do not address whether delegation by incorporation would apply in a consumer case or one involving an unsophisticated party. Neither do any of these cases suggest the FAA requires them to find that incorporation of the AAA rules is sufficient to delegate the issue of arbitrability. Delegation of arbitrability is simply an infer-

ence they have drawn in the sophisticated business transactions presented to them. *Id.* *Brennan* said it would apply such a presumption to the sophisticated entities in that case, but it expressly left unresolved the question of whether "incorporation of the AAA rules can be clear and unmistakable evidence of delegation of arbitrarily where one party is an unsophisticated consumer." *Ingalls v. Spotify USA, Inc.*, 2016 WL 6679561, at *3 (N.D. Cal. Nov. 14, 2016); *see also Quilloin v. Tenet Health-System Philadelphia, Inc.*, 673 F.3d 221 (3d Cir. 2012) (refusing to find delegation of questions of arbitrability in case in which contract said AAA rules governed).

The unsophisticated consumer issue has been directly determined in numerous district court cases in the Ninth Circuit. Even prior to *Brennan*, the district court in *Tomkins v. 23andMe, Inc.*, 2014 WL 2903752, at *11 (N.D. Cal. June 25, 2014), held incorporation by reference of the AAA rules is just one factor in determining whether the parties intended to delegate the arbitrability decision to the arbitrator. *Tomkins* concluded "incorporation of the AAA rules does not necessarily amount to 'clear and unmistakable' evidence of delegation, particularly when the party asked to accept the agreement is a consumer." *Id.* The court subsequently refused to extend the presumption used in cases between sophisticated commercial parties to cases involving consumers if the arbitration agreement itself "lacks an express delegation provision on its face, so a consumer would have to look up the AAA

---

**2.** *See Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 673-74 (5th Cir. 2012) (dispute between a subcontracting corporation against the general contractor company); *Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366, 1368 (Fed. Cir. 2006) (patent infringement dispute between telecommunication corporations); *Terminix Int'l Co. v. Palm-* er Ranch Ltd. P'ship, 432 F.3d 1327, 1329 (11th Cir. 2005) (dispute between limited partnerships arising from 20 extermination service contracts); *Contec Corp. v. Remote Solution Co.*, 398 F.3d 205, 207 (2d Cir. 2005) (indemnification dispute between electronics corporations).

rules to find [the delegation provision]." [3] *Id.*

Since *Brennan*, "Every district court decision in [the Ninth Circuit] to address the question ... has [followed the *Tomkins* approach and] held that incorporation of the AAA rules was insufficient to establish delegation in consumer contracts involving at least one unsophisticated party." *Ingalls*, 2016 WL 6679561, at *3; *Money Mailer, LLC v. Brewer*, 2016 WL 1393492, at *2 (W.D. Wash. Apr. 8, 2016); *Galilea, LLC v. AGCS Marine Ins. Co.*, 2016 WL 1328920, at *3 (D. Mont. Apr. 5, 2016); *Vargas v. Delivery Outsourcing, LLC*, 2016 WL 946112, at *8 (N.D. Cal. Mar. 14, 2016); *Aviles v. Quik Pick Express, LLC*, 2015 WL 9810998, at *6 (C.D. Cal. Dec. 3, 2015); *Meadows v. Dickey's Barbecue Rest. Inc.*, 144 F.Supp.3d 1069, 1078 (N.D. Cal. 2015).

For example, in *Meadows*, after noting "an inquiry about whether the parties clearly and unmistakably delegated arbitrability by incorporation should first consider the position of those parties," the court concluded it is "much less reasonable" to find " 'clear and unmistakable' evidence of delegation" for an "inexperienced individual, untrained in the law," such as a restaurant franchisee, than it is for "a large corporation ... or a sophisticated attorney." *144 F.Supp.3d at 1078.*

Similarly, in *Aviles*, a truck driver filed suit against the defendant trucking company, which moved to compel arbitration. *2015 WL 9810998, at *1.* Even though the plaintiff was "an independent contractor who operates his own trucking business," the court deemed him an unsophisticated party because he was "untrained in the

law" and it was "doubtful that [he] actually understood the import of [the bolded delegation clause's] terms." *Id. at *6.* Based on the plaintiff's unsophisticated status, the court found there could not be clear and unmistakable intent to delegate. *Id.*

Again, in *Vargas*, an "unsophisticated luggage delivery driver" signed an arbitration agreement that included a delegation provision incorporating the AAA rules "without an opportunity to review the documents or consult with an attorney." *2016 WL 946112, at *8.* The court found the plaintiff's status as an "unsophisticated" party to be dispositive and held the delegation clause to be invalid because "incorporation of AAA's rules does not evidence a 'clear and unmistakable' intent to delegate disputes involving unsophisticated employees." *Id. at *7.*

In *Galilea*, the court held the plaintiffs, who had formed an LLC for the purpose of owning a boat, were "individual[s] not well-versed in arbitration law" and, therefore, "unlikely to be aware that the AAA rules provide for the arbitrator to determine his own jurisdiction." *2016 WL 1328920, at *3.* The court itself then determined arbitrability because the plaintiffs were not "sophisticated part[ies] for [arbitration] purposes." *Id.*

Finally, in *Money Mailer*, the court held incorporation of the AAA rules did not "show a 'clear and unmistakable' intent to delegate questions of arbitrability" when the bound party was a "small business owner ... [with] no legal experience." *2016 WL 1393492, at *2.*

The middle district of Alabama in *Palmer v. Infosys Technologies Ltd., Inc.*, 832

---

**3.** While the court in *Zenelaj v. Handybook Inc.*, 82 F.Supp.3d 968, 974 (N.D. Cal. 2015), said *Tomkins* did not base its holding on the fact it was a consumer case, *Tomkins* certainly treated the matter as a fact question requiring consideration of the consumer's lack of sophistication and bargaining power. Prior to *Brennan*, however, the *Zenelaj* decision had caused a circuit split on this issue.

*F.Supp.2d 1341 (M.D. Ala. 2013)*, similarly refused to hold mere incorporation of the AAA rules into an arbitration provision constitutes a clear and unmistakable agreement to delegate the issue of arbitrability. This is particularly true when the relevant state law provides such issues are to be resolved by the court, as *Palmer* found was the case in California and as is the case in Missouri for the reasons already noted in cases involving unsophisticated consumers. *Id. at 1344.*

The single United States court of appeals case on which the majority relies involving a consumer, *Fallo*, simply assumed the incorporation rule applied in the consumer context before it, without recognizing the cases it relied on were commercial cases. *559 F.3d at 878-79.* Further, while *Fallo* says it affirmed delegation of arbitrability to the arbitrator, it then proceeded to interpret delegation as including only the question of what claims were subject to arbitration, for it went on to consider the merits of Fallo's unconscionability challenge rather than leaving that issue to the arbitrator. *Id. Fallo* has been further limited by the Eighth Circuit's decision in *Nebraska Machinery Co. v. Cargotec Solutions, LLC, 762 F.3d 737, 741 n.2 (8th Cir. 2014)*, which said the question of the existence of an agreement to arbitrate is for the court.

Far more persuasive is the decision by the Montana Supreme Court in *Global Client Solutions v. Ossello, 382 Mont. 345, 367 P.3d 361 (2016)*, that, like the federal district court cases just discussed, rejected the idea there is a " 'general rule' that incorporation of the AAA rules into an arbitration clause constitutes an agreement to arbitrate arbitrability." *Id. at 369.* Noting the only cases finding otherwise "almost exclusively involve[d] arbitration disputes between sophisticated parties in commercial settings," *Ossello* refused to find the parties had agreed to arbitrate arbitrability, noting "the AAA rules [were] not part of the record and neither the DAA nor [the creditor's] arguments specify which of the multiple sets of commercial or consumer AAA rules [were] supposedly incorporated [into the contract]." *Id.* While here, as the majority notes, attorneys for both parties located the relevant AAA rules and attached them to their motions, the question is not what sophisticated legal minds can figure out today about the AAA rules but rather what a student such as Mr. Pinkerton understood at the time. As in *Ossello*, the AAA rules were neither attached nor explained at the only time that is relevant in determining Mr. Pinkerton's intent.

In *Morgan v. Sanford Brown Institute, 225 N.J. 289, 137 A.3d 1168 (2016)*, the Supreme Court of New Jersey held an arbitration delegation provision in an enrollment agreement between student-plaintiffs and a college that said it was to be administered according to AAA rules was unenforceable because it "did not clearly and unmistakably" show intent to "delegate arbitrability." *Id. at 1182.* The contract in question was written "in nine-point font" and included a "more than 750-word arbitration clause set forth in thirty-five unbroken lines." *Id. at 1181.* The court noted, "The meaning of arbitration is not self-evident to the average consumer." *Id. at 1180.* It concluded, therefore, that such a provision could not be enforceable unless it "explain[ed] in some broad or general way that arbitration is a substitute for the right to seek relief in our court system." *Id. at 1179.*

The majority just waves off these cases by saying they are not consistent with Missouri law. But for all of the reasons already discussed, they are indeed consistent with Missouri law's recognition that the sophistication of the signer affects the

determination whether a contract waiver is ambiguous. It is the majority that is incorrectly treating an arbitration clause differently than it treats other contractual attempts to waive the litigation rights of an unsophisticated consumer.

Under these settled principles of Missouri law, while a consumer signing a student enrollment form including an arbitration agreement may understand the right to sue over certain types of claims in court are being waived, that does not apprise the student that the validity of the waiver itself will be determined by the arbitrator rather than by a court. Just as *Purcell* and the other cited cases recognized that use of general language about waivers might be insufficient in a consumer context involving an unsophisticated party, so here use of general incorporation by reference language should not be sufficient to constitute irrebuttable proof of an intent to delegate arbitrability. Indeed, the concerns expressed in those cases have even greater application because the United States Supreme Court has held the party seeking to require arbitration has the burden of proving by "clear and unmistakable" evidence that the other party intended to delegate arbitrability to the arbitrator.

At a minimum, this is a question of fact that should be put to the parties' proof, not decided by an irrebuttable presumption. As *Alack* stated, "our law on such an important point cannot be so out of step with the understanding of our citizens." *923 S.W.2d at 337*. This Court should recognize a generally applicable principle of Missouri contract law that when a consumer contract purports to incorporate by reference another writing, the court should determine whether the parties actually know and understand the provisions to be included.

Applying these principles here, Mr. Pinkerton was a young, non-college educated student who was trying to go to school to learn how to repair aircraft engines. The school he attended is a large for-profit corporation. The school did not provide Mr. Pinkerton with a copy of the AAA rules. Nothing in the contract explains the content of the AAA rules even generally, nor does the contract explain where and how to find them. The contract does not explain that, while the referenced rules were called "commercial" rules at that time, they nonetheless applied to consumers like Mr. Pinkerton and precluded him from having a court decide whether the agreement or the delegation provision was enforceable or binding. An average consumer might well presume the rules are simply that: rules governing the procedural aspects of arbitration, not "rules" that actually take away the consumer's rights. Certainly nothing in the contract mentioned delegation of arbitration decisions to an arbitrator. It is not surprising that both Mr. Pinkerton and the school's agent testified they had no idea what the AAA rules contained and no idea what they required the arbitrator or the court to decide. Neither said they understood the rules delegated to an arbitrator the arbitrability issue itself.

On these facts, a trial court certainly could find Mr. Pinkerton did not "clearly and unmistakably" intend to delegate arbitrability to an arbitrator. This Court should remand the case for a factual determination whether Mr. Pinkerton actually knew and understood what the provisions of the AAA rules were, where he could find them, and whether, as a matter of fact, he clearly and unmistakably showed an intent to delegate arbitrability issues to an arbitrator.

## II. MR. PINKERTON SPECIFICALLY CHALLENGED THE DELEGATION PROVISION

The majority notes the Supreme Court has held that to challenge the delegation of

arbitrability, a party has to have challenged the provision specifically. The majority then states Mr. Pinkerton failed to do so in the trial court.[4] The latter statement is factually incorrect. The record clearly shows Mr. Pinkerton argued—in opposition to the motion to refer the matter to arbitration—that the arbitration agreement, including the delegation clause, was invalid. Indeed, in his suggestions in opposition to the defendant's renewed motion to compel arbitration, in response to the school's claim he had not raised the issue specifically, Mr. Pinkerton used capital letters for emphasis in stating he did raise the issue and repeated he "disputes the existence and enforceability of any agreement to delegate issues of arbitrability to an arbitrator." He similarly argues in this Court that the putative delegation provision does "not delegate any threshold issues to an arbitrator." This issue was preserved.

### III. UNCONSCIONABILITY IS A CONTRACT FORMATION ISSUE

While the majority recognizes "this Court has held that unconscionability is a state law defense to contract formation," the majority nonetheless unnecessarily creates uncertainty by suggesting it is not sure why this is the case because "conscionability is not an essential element of contract formation. As such, while unconscionability is a defense to contract formation and, therefore, a contract's validity and enforceability, it is not an issue of whether a contract has ever been concluded." *Slip op. at *20* (citations and quotation omitted).

This dicta interprets the term "contract formation" more narrowly than does the Supreme Court. Indeed, as this Court explained in *Brewer v. Missouri Title Loans, 364 S.W.3d at 492 n.3*:

> While Missouri courts traditionally have discussed unconscionability under the lens of *procedural* unconscionability and *substantive* unconscionability, *Concepcion* instead dictates a review that limits the discussion to whether state law defenses such as unconscionability impact the *formation* of a contract. ... Accordingly, the analysis in this Court's ruling today—as well as this Court's ruling in *Robinson v. Title Lenders, Inc.,*—no longer focuses on a discussion of procedural unconscionability or substantive unconscionability, but instead is limited to a discussion of facts relating to unconscionability impacting the formation of the contract.

(Citations and quotation omitted.)

In other words, the unconscionability of the terms of a contract may be such that it negates the formation of the contract at all, or the unconscionability may instead impact enforcement of particular terms or of the contract as a whole. *Robinson* pointed out the former type of unconscionability in formation is exemplified by "procedural" unconscionability such as "high pressure sales tactics, unreadable fine print, or misrepresentation among other unfair issues in the contract formation process." *Robinson v. Title Lenders, Inc., 364 S.W.3d 505, 508 n.2 (Mo. banc 2012), quoting, State ex rel. Vincent v. Schneider, 194 S.W.3d 853, 858 (Mo. banc 2006). Brewer* advised that

---

4. The Supreme Court recognizes two types of challenges to the validity of arbitration: "One type challenges specifically the validity of the agreement to arbitrate. ... The other challenges the contract as a whole...." *Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 444, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006).*

A challenge to a delegation provision within an arbitration agreement must be made to that provision specifically as distinct from a challenge to the arbitration agreement as a whole. *Rent–A–Ctr., 561 U.S. at 70-72, 130 S.Ct. 2772.*

in cases otherwise subject to arbitration, "Future decisions by Missouri's courts addressing unconscionability likewise shall limit review of the defense of unconscionability to the context of its relevance to contract formation." *364 S.W.3d at 493 n.3.*

The Supreme Court has recognized unconscionability may affect contract formation or may be an issue of contract enforcement.[5] The same reasoning applies to other defenses such as duress or fraud. *Brewer* and relevant Supreme Court cases recognize duress as a defense against formation, but lack of duress is not an essential element of contract formation. *Baker v. Bristol Care, Inc.,* 450 S.W.3d 770, 782 *(Mo. 2014)* ("[A] contract is *voidable* due to ... duress ... but such [a] defense [has] nothing to do with contract formation. In fact, [duress] defenses assume a contract was formed.") (citations omitted). It does not follow that a party alleging duress is not raising a contract formation challenge. The same is true of fraud.

For these reasons, I dissent from the majority's holding that Mr. Pinkerton did not preserve the issue of delegation, its questioning of the fact that unconscionability has been recognized as an issue of contract formation, and its holding that, in a consumer case such as this, the mere reference to incorporation of the AAA rules, without their attachment and without specifically referencing the incorporation of the delegation provision, is unambiguous. I believe the language would be

ambiguous to an unsophisticated party if the Court does as *Purcell* requires and considers the context and the parties' relative sophistication. The case should be remanded for determination of the factual question whether an unsophisticated student such as Mr. Pinkerton clearly and unmistakably intended to delegate the issue of arbitrability to the arbitrator.

---

**5.** *E.g., Granite Rock Co. v. Int'l Bhd. of Teamsters,* 561 U.S. 287, 304 n.9, 130 S.Ct. 2847, 177 L.Ed.2d 567 (2010) ("The parties' dispute about the [contract]'s ratification date presents a formation question in the sense above, and is therefore not on all fours with, for example, the formation disputes we referenced in *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 444, n. 1, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006), which concerned whether, not when, an agreement to arbitrate was 'concluded.' "); *Buckeye,* 546

U.S. at 444 n.1, 126 S.Ct. 1204 ("The issue of the contract's validity is different from the issue whether any agreement between the alleged obligor and obligee was ever concluded."). *Buckeye* went on to list several examples of formation questions, including "whether [a party] ever signed the contract, whether the signor lacked authority to commit the alleged principal, and whether the signor lacked the mental capacity to assent." *546 U.S. at 444 n.1, 126 S.Ct. 1204* (citations omitted).