

# Missouri Court of Appeals

## Southern District

### Division Two

MARK HOPWOOD and
MARY HOPWOOD,

    Plaintiffs-Respondents,

v.

CITIFINANCIAL, INC. and
ZACHREY B. BOULWARE,

    Defendants-Appellants.

)
)
)
)
)
)
)
)
)
)
)
)
)

No. SD32633
Filed: 2-5-14

### APPEAL FROM THE CIRCUIT COURT OF POLK COUNTY

Honorable Michael O. Hendrickson, Circuit Judge

### **AFFIRMED**

CitiFinancial, Inc. (CitiFinancial) and Zachrey Boulware (collectively, Appellants) appeal from the trial court's judgment denying their motion to compel arbitration of claims of Mark and Mary Hopwood (Respondents) for fraudulent misrepresentation, negligent misrepresentation, and violation of the Missouri Merchandising Practices Act (MMPA). Finding no merit in either of Appellants' points, we affirm the trial court's judgment.

The facts giving rise to this interlocutory appeal are not in dispute. Between 2003 and 2005, Respondents executed three arbitration agreements with CitiFinancial in

conjunction with three separate loan transactions. Each of the nearly identical arbitration agreements purported to cover all future extensions of credit and the arbitrability of any claims against CitiFinancial:

> "Credit Transaction" means any one or more past, present, or future extensions, applications, or inquiries of credit or forebearance of payment . … "Claim" means any case, controversy, dispute, tort, disagreement, lawsuit, or claim now or hereafter existing between You and Us. A Claim includes, without limitation, anything related to: The Note, this Agreement, or the enforceability or arbitrability of any Claim pursuant to this Agreement, including but not limited to the scope of this Agreement and any defenses to enforcement of the Note or this Agreement[.]

In 2006, Respondents executed a "Note and Security Agreement" with CitiFinancial (the 2006 Note), which is the subject of this appeal. Respondents did not execute an arbitration agreement in conjunction with the 2006 Note. Further, the 2006 Note contained a merger clause, which stated: "To protect you (Borrower(s)) and us (Creditor) from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it."

In 2012, Respondents filed the underlying action against Appellants alleging claims for fraudulent misrepresentation, negligent misrepresentation, and violation of the MMPA regarding the 2006 Note and subsequently executed "Adjustment of Terms" agreements. Appellants responded with a motion to compel arbitration, arguing that the arbitration agreements executed between 2003 and 2005, which purported to govern future extensions of credit, applied to Respondents' claims. The trial court denied Appellants' motion.[1] This appeal followed.

---

[1] In a docket entry, the trial court specifically noted that the 2006 Note was silent as to arbitration and contained the merger clause.

2

In Point I, Appellants assert the trial court erred in denying their motion because pursuant to the arbitration agreements, the arbitrator must decide whether arbitration is appropriate. In Point II, Appellants state the trial court erred in denying their motion because the three arbitration agreements executed between 2003 and 2005 apply to Respondents' claims derived from the 2006 Note. We address Appellants' points together for clarity of analysis.[2]

The question of whether a motion to compel arbitration should have been granted is one of law, which we review *de novo*. ***Johnson ex rel. Johnson v. JF Enters., LLC***, 400 S.W.3d 763, 766 (Mo. banc 2013).

Appellants' first argument fails because it presumes the existence of a valid arbitration agreement applicable to Respondents' underlying claims. A party can be forced to arbitrate a dispute only when it has agreed to do so. ***AJM Packaging Corp. v. Crossland Constr. Co., Inc.***, 962 S.W.2d 906, 911 (Mo. App. 1998). "Before a party may be compelled to arbitrate under the FAA, *a court* must determine whether a valid agreement to arbitrate exists between the parties and whether the specific dispute falls within the substantive scope of that agreement." ***Dunn Indus. Group, Inc. v. City of Sugar Creek***, 112 S.W.3d 421, 427-28 (Mo. banc 2003) (emphasis added). Therefore, the first question properly before the trial court was whether there was an enforceable arbitration agreement between Appellants and Respondents.

---

[2] We note that the Federal Arbitration Act (FAA) would apply in this case, as the transaction is one "involving commerce" and some of the parties reside in different states. ***Kansas City Urology, P.A. v. United Healthcare Servs.***, 261 S.W.3d 7, 10 (Mo. App. 2008); *see also* 9 U.S.C. § 2 (2006). The first question for our determination is whether or not the parties executed a valid, enforceable arbitration agreement applicable to claims arising out of the 2006 Note. To answer that question, we "apply the usual rules of state contract law and canons of contract interpretation." ***Netco, Inc. v. Dunn***, 194 S.W.3d 353, 358 (Mo. banc 2006).

In support of their position, Appellants rely heavily on *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995). Appellants' reliance on *First Options* is misguided, and we disagree with Appellants' broad interpretation of the Court's analysis. In *First Options*, the Court was faced with a question regarding the appropriate level of deference given to an arbitrator's arbitrability decision. *Id*. at 942-43. The Court's analysis made clear that the question of whether the parties intended to submit the issue of arbitrability to an arbitrator was one for determination by a court applying ordinary state law contract principles:

> When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally (though with a qualification we discuss below) should apply ordinary state-law principles that govern the formation of contracts. … Courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so.

*Id*. at 944 (citation and quotation marks omitted). *First Options* does not dictate, as Appellants insist, that the trial court "usurped" its authority in finding in the first instance that there was no binding arbitration agreement between the parties. Appellants' faulty reasoning presumes that the three prior arbitration agreements are binding on the parties for claims arising out of the 2006 Note transaction. In doing so, they also presume that the language of the earlier arbitration agreements – stating that the parties agree to arbitrate arbitrability – applies to Respondents' claims. The trial court found otherwise and determined that there was no arbitration agreement between the parties applicable to Respondents' claims. In the absence of an enforceable arbitration agreement applicable to the 2006 Note transaction, there are no issues for an arbitrator to decide.

In response to Point II, we agree with the trial court that the earlier-executed arbitration agreements do not apply to Respondents' claims arising from the 2006 Note.

Appellants preface their second point by arguing that public policy dictates we must resolve all doubts in favor of arbitration. While that general principle is true, the preference for arbitration only applies when a valid arbitration agreement exists between the parties. *See* **Korte Constr. Co. v. Deaconess Manor Ass'n**, 927 S.W.2d 395, 398 (Mo. App. 1996). "Standing alone, a public policy favoring arbitration is not enough to extend the application of an arbitration clause far beyond its intended scope." **Northwest Chrysler-Plymouth, Inc. v. DaimlerChrysler Corp.**, 168 S.W.3d 693, 696 (Mo. App. 2005). "The FAA places arbitration agreements on an equal footing with other contracts, and courts will examine arbitration agreements in the same light as they would examine any contractual agreement." **Triarch Indus., Inc. v. Crabtree**, 158 S.W.3d 772, 776 (Mo. banc 2005). "The guiding principle of contract interpretation under Missouri law is that a court will seek to ascertain the intent of the parties and to give effect to that intent." **Id**.

Here, the 2006 Note was silent as to arbitration, and no separate arbitration agreement was contemporaneously executed.[3] In addition, the 2006 Note contains a merger clause stating that it was "the complete and exclusive statement of the agreement" between the parties. This procedure stands in stark contrast to the three prior transactions between the parties. In each of those transactions, a new arbitration agreement was executed in conjunction with the note. More importantly, each of those arbitration agreements referenced – by date and account number – the note to which it was related.

---

[3] Appellants argue that the trial court erred by looking to the 2006 Note to determine the intent of the parties as to arbitration. While courts traditionally evaluate the arbitration agreement to determine the intent of the parties with respect to dispute resolution, this case presents a unique scenario in that the arbitration agreements Appellants assert apply in this instance were executed years earlier as a part of completely different and independent transactions. There was no arbitration agreement or clause executed as part of the instant transaction for the court to evaluate.

5

In spite of those facts, Appellants ask us to interpret the general definition of "credit transaction" in the earlier arbitration agreements to apply to the 2006 Note transaction on the theory that the parties intended to agree to arbitrate *any* dispute of *any* transaction arising at *any* time between the parties, so long as it involved an extension, application or inquiry of credit. We decline to adopt such an unreasonable interpretation of the earlier arbitration agreements. *See **Wildflower Community Ass'n, Inc. v. Rinderknecht***, 25 S.W.3d 530, 536 (Mo. App. 2000) (when interpreting a contract, a court attempts to avoid absurd results). If Appellants' interpretation were correct, only one arbitration agreement would have needed to be executed in conjunction with the first extension of credit. The execution of the next two arbitration agreements would be meaningless, as would the language in each arbitration agreement identifying the specific note and account numbers related to that transaction. Because Appellants executed a specific arbitration agreement for each of the earlier three transactions, it was reasonable for the trial court to conclude that the different procedure employed with respect to the 2006 Note (including its merger clause) demonstrated the parties' intent not to arbitrate issues relating to that extension of credit. *See **Johnson***, 400 S.W.3d at 769 (finding the intent of the parties evidenced by the documents signed contemporaneously); ***Stone v. Farm Bureau Town & Country Ins. Co. of Missouri***, 203 S.W.3d 736, 745 (Mo. App. 2006) (applying "the well-established principle that the interpretation placed on a contract by the parties before it becomes a matter of controversy is entitled to great weight in ascertaining their intent and understanding, and the courts will generally follow the parties' own practical interpretation of the agreement"). The trial court's decision correctly applied the principle in ***First Options*** that "[c]ourts should not assume that the

parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." ***First Options***, 514 U.S. at 944 (quotation marks omitted). The court properly considered the documents executed in connection with the earlier notes, as well as those executed contemporaneously with the 2006 Note, to determine the parties' intent.

Appellants argue that our Supreme Court's analysis in ***Johnson*** is dispositive here and requires us to ignore the impact of the merger clause contained in the 2006 Note. We disagree. In ***Johnson***, the Court interpreted two documents that were executed contemporaneously: a sales contract containing a merger clause and an arbitration agreement. ***Johnson***, 400 S.W.3d at 768-69. The Court found that the documents could be harmonized and evidenced the parties' intent to give effect to the arbitration provisions with respect to all disputes:

> [T]he circumstances demonstrate that they were part of a single transaction. Under the general rule that contemporaneously signed documents relating to one subject matter or transaction are construed together, the parties intended to give effect to all the documents Ms. Johnson executed in her purchase of the vehicle. Because there is no evidence of contrary intent, this Court considers the purchase documents together to determine the parties' intent as to the scope of the merger clause and of the arbitration agreement.

*Id*. at 768. Thus, our Supreme Court looked at all of the documents contemporaneously signed as part of a single transaction, including the arbitration agreement, to discern the parties' intent. *See **id***. The case at bar is different because it involves four extensions of credit at different times that did not use the same documents for each transaction. Unlike ***Johnson***, there is evidence of a contrary intent here because: (1) the parties executed individual arbitration agreements in the first three transactions; but (2) but they did not do so in connection with the 2006 Note, which also contained a merger clause. Therefore,

7

*Johnson* is factually distinguishable, and its analysis is consistent with the result we reach here.

Appellants' points are denied, and the judgment of the trial court is affirmed.

JEFFREY W. BATES, P.J. – OPINION AUTHOR

DON E. BURRELL, J. – CONCUR

MARY W. SHEFFIELD, J. – CONCUR