

# In the Missouri Court of Appeals
# Eastern District

## DIVISION TWO

| | | |
|---|---|---|
| ST. LOUIS REGIONAL CONVENTION AND SPORTS COMPLEX AUTHORITY, ET AL., | ) ) ) ) | No. ED106282-01 |
| Respondents, | ) ) | Appeal from the Circuit Court of the City of St. Louis |
| vs. | ) ) | Honorable Christopher E. McGraugh |
| NATIONAL FOOTBALL LEAGUE, ET AL., and THE RAMS FOOTBALL COMPANY, LLC and E. STANLEY KROENKE, | ) ) ) ) | |
| Appellants. | ) | Filed: April 16, 2019 |

## Introduction

The St. Louis Regional Convention and Sports Complex Authority (the "RSA"), the City of St. Louis (the "City"), and St. Louis County (the "County") (collectively "Plaintiffs") sued The Rams Football Company, LLC ("Rams"), the National Football League ("NFL"), through its thirty-two member clubs, and the clubs' owners, including E. Stanley Kroenke ("Kroenke"), the Rams' owner (collectively "Defendants"), alleging five counts arising out of the Rams' 2016 relocation from St. Louis to Los Angeles. Plaintiffs sued based on their alleged status as third-party beneficiaries of the NFL's "Policy and Procedures for Proposed Franchise Relocations" (the "NFL Policy"). The Rams and Kroenke moved to compel arbitration, arguing the "NFL Franchise Relocation Agreement" (the "1995 Relocation Agreement") and the "Amended and

Restated St. Louis NFL Lease" (the "1995 Lease") entered in 1995 when the Rams relocated from the Los Angeles market to St. Louis compelled arbitration because those contracts contain mandatory arbitration provisions and Plaintiffs' claims "touch matters" covered by those contracts. The trial court denied the Rams and Kroenke's motion to compel.

The Rams and Kroenke ("Appellants") appeal that decision. On Point I, Appellants argue the American Arbitration Association Rule 7(a) had been incorporated by reference into the contract's arbitration clause by "the most applicable then existing rules of the American Arbitration Association," provided "clear and unmistakable" evidence of the parties' contractual intent in 1995 to delegate exclusive jurisdiction to an arbitrator to determine arbitrability of this dispute. On Point II, Appellants contend Plaintiffs and Appellants' dispute touches matters covered by the 1995 Lease and 1995 Relocation Agreement containing mandatory broad arbitration clauses and therefore Plaintiffs' claims must be arbitrated. On Point III, Appellants contend Kroenke, an agent of the Rams, may invoke the arbitration provisions in the 1995 Lease and 1995 Relocation Agreement because an agent of a signatory to an arbitration clause may invoke arbitration against another signatory.

Because we conclude an AAA arbitration rule first appearing in 2003 could not provide "clear and unmistakable" evidence of the parties' affirmative contractual intent in 1995 for an arbitrator to have exclusive jurisdiction to decide arbitrability as required under *State ex rel. Pinkerton v. Fahnestock*, 531 S.W.3d 36, 42 (Mo. banc 2017), and because we find there is no arbitration agreement applicable to Plaintiffs' claims, we affirm.

**Factual and Procedural Background**

**A. *The NFL Constitution and Bylaws***

Article 4.3 of the NFL Constitution and Bylaws requires an affirmative vote of three-fourths of its member clubs before a club may transfer its franchise or playing site to a different city. Article 4.3 confirms that each club's primary obligation to the NFL and to all other member clubs is to advance the interests of the NFL in its home city. Article 4.3 also confirms that no club has an "entitlement" to relocate simply because it perceives an opportunity for enhanced club revenues in another location. Relocation under Article 4.3 may be available, however, if a club's viability in its home city is threatened by circumstances that cannot be remedied by diligent efforts of the club working with the NFL, or if compelling NFL interests warrant a franchise relocation.

**B. *The NFL's Relocation Policy***

In 1984, under the NFL Constitution and Bylaws, the NFL adopted the NFL Policy. The NFL Policy sets forth the policies and procedures that apply to any proposed transfer of a club's home territory. The NFL Policy states that because the NFL favors stable team-community relations, clubs are obligated to work diligently and in good faith to obtain and to maintain suitable stadium facilities in their home city, and to operate in a manner that maximizes fan support in their current home community.

The NFL Policy requires a club to submit a proposal for transfer to the NFL before it may transfer its franchise or playing site outside its current home city. The club must give the Commissioner of the NFL written notice of its proposed transfer and a "statement of reasons" to support the proposed transfer. The NFL Policy provides that the Commissioner will evaluate the proposed transfer and report to the members. Following the Commissioner's report, the proposal

is presented to the members for a vote. In considering a proposed relocation, the clubs may consider several factors, but must address the degree to which the club has engaged in good faith negotiations, and enlisted the NFL to assist in such negotiations, with persons about terms and conditions under which the club would remain in its current home city and afforded that community a reasonable amount of time to address proposals.

The NFL Policy states that if a club's proposal to relocate to a new home territory is approved, the relocating club will ordinarily be expected to pay a transfer fee to the NFL. The transfer fee will compensate other member clubs of the NFL for losing the opportunity appropriated by the relocating club and the enhancement in the value of the franchise resulting from the move. The NFL Policy has no arbitration provision.

### C. The Rams' 1995 Relocation From the Los Angeles Market to St. Louis

In 1995, the Rams submitted a proposal to relocate their home playing site from Anaheim to St. Louis. Upon NFL approval, the Rams relocated to St. Louis effective with the 1995 NFL season. As a part of that relocation, the Rams, the Regional Convention and Visitors Commission ("CVC"), and the St. Louis NFL Corporation ("SLNFL") entered into the 1995 Lease. Section 25 of the 1995 Lease contained an arbitration provision stating:

> Any controversy, dispute or claim between or among any of the parties hereto (and/or any of those consenting hereto pursuant to the Consents to Assignment (other than the City, County or SLMFC, which may only bring an action or against which an action may only be brought in United States Federal District Court for the Eastern District of Missouri, with the right to jury waived)) to this Amended Lease, related to this Amended Lease, including, without limitation, any claim arising out of, in connection with, or in relation to the interpretation, performance or breach of this Amended Lease (including any determination of whether the "First Tier" or "First Class" standard provided in Section 1.3 of Annex 1 to this Amended Lease has been met) shall be settled by arbitration conducted before three arbitrators in St. Louis, Missouri, in accordance with the most applicable then existing rules of the American Arbitration Association (or its successor or in the absence of a successor, an institution or organization offering similar services), and judgment upon any award rendered by the arbitrator may be

4

entered by any federal or state court having jurisdiction thereof. Such arbitration shall be the exclusive dispute resolution mechanism. . . .

The Rams, the CVC, the RSA, Fans, Inc., and the SLNFL also entered into the 1995 Relocation Agreement.[1] The 1995 Relocation Agreement contained an arbitration provision stating:

> Any controversy, dispute or claim between or among any of the parties hereto related to this Relocation Agreement, including without limitation, any claim arising out of, in connection with, or in relation to the interpretation, performance or breach of this Relocation Agreement shall be settled by arbitration as set forth or as otherwise provided in Section 25 or the Amended Lease.

### D. The Rams' 2016 Relocation From St. Louis to Los Angeles

In January 2016, the Rams submitted a proposed relocation application to relocate from St. Louis to Los Angeles and a statement of reasons in support to the NFL. On January 12, 2016, the club owners voted to allow the relocation of the Rams from St. Louis to Los Angeles.[2] The Rams terminated the 1995 Lease and relocated to Los Angeles effective with the 2017 NFL season.

### E. Plaintiffs' Suit

Plaintiffs filed this suit as result of the Rams' 2016 relocation. Plaintiffs alleged Defendants violated the obligations and standards governing team relocations by seeking and approving the relocation of the Rams from St. Louis to Los Angeles, despite Defendants' failure to satisfy the obligations imposed by the NFL Policy. Plaintiffs alleged that in reliance on Defendants' obligations imposed by the NFL Policy they took action to develop and finance a new stadium complex to keep the Rams in St. Louis. The suit alleges five counts: (1) breach of

---

[1] The City and County are listed as "Sponsors" of the 1995 Lease and the 1995 Relocation Agreement. The parties have not raised any issue about whether the City and County's status as "Sponsors" made them parties to those contracts.

[2] Counsel for Appellants conceded at oral argument the Rams needed an affirmative vote from three-fourths of the members clubs pursuant to the NFL Policy before it could relocate from St. Louis to Los Angeles.

contract, specifically breaches of the NFL Policy's obligation of diligence and good faith against all Defendants, based on Plaintiffs status as third-party beneficiaries of the NFL Policy; (2) unjust enrichment against all Defendants for violating the NFL Policy and relocating to Los Angeles, resulting in the Rams alleged $550 million relocation fee payment to the other Defendants and the Rams' alleged increased franchise value; (3) fraudulent misrepresentation against Appellants based upon alleged false and misleading statements made by Appellants that induced Plaintiffs to spend considerable time and money financing and working on a new stadium complex; (4) fraudulent misrepresentation against all Defendants based upon Defendants' alleged fraudulent misrepresentations that induced Plaintiffs to spend considerable time and money financing and working on a new stadium complex plan; and (5) tortious inference with business expectancy against all Defendants, except the Rams, based upon the Defendants' intentional interference with Plaintiffs' reasonable business expectancy by approving the Rams' relocation. The only exhibit attached to Plaintiffs' petition was the NFL Policy.

The Rams and Kroenke moved to compel arbitration which was denied. None of the other Defendants besides the Rams and Kroenke were parties to the motion to compel arbitration and are not parties to this appeal.[3] The Rams and Kroenke ("Appellants") appeal that decision.[4]

---

[3] The denial of a motion to compel arbitration is appealable under section 435.440 RSMo (2016). "Although normally an order that does not dispose of all the parties and claims is not appealable, an order overruling a motion to compel arbitration is immediately appealable under section 435.440.1(1), RSMo 2000." *Eaton v. CMH Homes, Inc.*, 461 S.W.3d 426, 431 n.2 (Mo. banc 2015).

[4] Following oral argument, Plaintiffs filed a letter and an exhibit with the clerk purportedly pursuant to Local Rule 370. Local Rule 370 provides that "[c]ounsel may call the court's attention to intervening decisions or new developments by filing a short letter providing the supplemental citations with the clerk in accordance with Rule 84.20 and Rule 30.08." Plaintiffs did not provide the clerk with supplemental citations but attempted to supplement the record on appeal. Local Rule 370 is not the proper procedure for supplementing the record on appeal. We have not considered the letter or the exhibit in deciding this appeal.

**Standard of Review**

We review do novo the legal issue of whether an arbitration agreement exists between the parties. *State ex rel. Pinkerton v. Fahnestock*, 531 S.W.3d 36, 42 (Mo. banc 2017). Whether a motion to compel arbitration should have been granted is a question of law subject to de novo review. *Triarch Indus., Inc. v. Crabtree*, 158 S.W.3d 772, 774 (Mo. banc 2005).

**Discussion**

Appellants raise three points on appeal. Appellants contend the trial court erred by denying their motion to compel arbitration because: (1) Plaintiffs and Appellants "clearly and unmistakably" agreed as a matter of law to delegate to the arbitrators the power to decide whether Plaintiffs' claims must be arbitrated by incorporating the rules of the American Arbitration Association ("AAA") in the arbitration clauses into the 1995 Lease and 1995 Relocation Agreement; (2) Plaintiffs and Appellants' dispute touches matters covered by the 1995 Lease and 1995 Relocation Agreement containing mandatory broad arbitration clauses and therefore Plaintiffs' claims must be arbitrated; and (3) Kroenke, an agent of the Rams, may invoke the arbitration provisions in the 1995 Lease and 1995 Relocation Agreement because an agent of a signatory to an arbitration clause may invoke arbitration against another signatory. Each of Appellants' points is premised on the arbitration provisions in the 1995 Lease and 1995 Relocation Agreement being applicable to Plaintiffs' claims related to the NFL Policy, and in support, Appellants primarily rely on the Missouri Supreme Court's *Pinkerton* decision.

**Point I**

For Point I, Appellants argue the circuit court erred in determining the parties did not "clearly and unmistakably" agree to exclusively delegate arbitrability determinations to an arbitrator solely by reference to the 1993 rules of the American Arbitration Association (AAA).

Appellants contend the appropriate analysis, under *State ex rel. Pinkerton v. Fahnestock,* is we find "clear and unmistakable" evidence of the parties' contractual intent by incorporating an AAA jurisdictional competence rule which did not exist until 2003, through the contract's reference to "then-existent" arbitration rules of the AAA or some "similar services." Respondents note no "clear and unmistakable" evidence of the parties' intent can be traced back to the 1995 agreement, because such rules did not exist and could not have been specifically referenced to delegate such authority.

In *Pinkerton*, a student entered into an enrollment agreement with an aviation school that contained an arbitration agreement incorporating by reference the AAA commercial rules. After graduating from the school, the student could not find employment in the aviation field so he sued the school alleging various claims. The school moved to compel arbitration, and the circuit court granted the school's motion to compel arbitration. The student appealed, arguing the school's incorporation of the AAA rules into the arbitration agreement did not "clearly and unmistakably" express the parties' intent to delegate threshold issues of arbitrability to an arbitrator.

Applying Missouri's general contract principles, the Missouri Supreme Court held that by incorporating the commercial AAA rules into their arbitration agreement, which included a delegation provision at the time of formation, "the parties expressed their intent to arbitrate any dispute under these rules, including the AAA's 'jurisdiction' rule providing that the 'arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement.'" 531 S.W.3d at 48. The Court found the delegation provision clearly and unmistakably evidenced the parties' intent to delegate threshold issues of arbitrability to the arbitrator. *Id.*

8

*Pinkerton* directs us to look for "a clear reference to an identifiable, ascertainable set of rules," measured "**at the time the parties signed the underlying agreement**." *State ex rel. Pinkerton v. Fahnestock*, 531 S.W.3d 36, 45 n.2 (Mo. banc 2017) (noting different versions of the rules contain the same jurisdiction clause)(emphasis added). When considering whether parties have intended to delegate threshold questions of arbitrability to an arbitrator, "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is clea[r] and unmistakabl[e] evidence that they **did** so." *State ex rel. Pinkerton v. Fahnestock*, 531 S.W.3d 36, 43 (Mo. banc 2017) (citing *Rent–A–Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 69 n.1, 130 S.Ct. 2772, 177 L.Ed.2d 403 (2010)) (emphasis added). [5] The language chosen must unambiguously establish the "parties' manifestation of intent" to withdraw from courts the authority to resolve issues of arbitrability. *Rent-A-Center, West Inc. v. Jackson,* 561 U.S. 63, 69 n.1 (2010). This language can be found, for example, where parties have "expressly agreed" to grant "exclusive authority" to an arbitrator. *Soars v. Easter Seals Midwest*, 563 S.W.3d 111, 114 (Mo. banc 2018). In *Soars*, a delegation provision "is simply an additional ***antecedent*** agreement the party seeking arbitration asks the court to enforce." *Soars*, 563 S.W.3d at 114. We look to the agreement to see if the parties ***affirmatively*** addressed the question of who decides arbitrability. *Dotson*, 472 S.W. 3d at 602; *accord Soars*, 563 S.W.3d at 114.

Appellants argue we can and should look to Federal court analysis undertaken by the Federal District Court for the Eastern District of Missouri in *McAllister v. The St. Louis Rams,*

---

[5] The recent United States Supreme Court decision in *Henry Schein, Incorporated, et al., v. Archer and White Sales, Incorporated*, 586 U.S. ——, 139 S.Ct. 524, 202 L.Ed.2d 480 (2019) does not impact our analysis. In *Henry Schein*, the Supreme Court addressed the "wholly groundless" exception applied by some federal courts to avoid sending a claim to arbitration when the **"argument for arbitration is wholly groundless."** *Id.* at 528. The Supreme Court held the "wholly groundless" exception to be inconsistent with the FAA and reiterated that when a contract delegates arbitrability to an arbitrator, the court may not override that contractual agreement. *Id.* at 528. However, the Court also reaffirmed that such delegation to an arbitrator must do so by "clear and unmistakable" evidence. *Id.* at 530. (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943–46, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995)).

*LLC,* No. 4:16–CV–172 SNLJ (E.D. Mo. Nov. 17, 2017). Appellants assert the *McAllister* Court reviewed identical language from the same contract which constrained it to find mere incorporation of the AAA rules to be "clear and unmistakable" evidence, adhering to Eighth Circuit precedent. *Id.* (citing *Fallo v. High-Tech Inst.*, 559 F.3d 874, 878 (8th Cir. 2009)). In *Fallo,* the Eighth Circuit reasoned AAA Rule 7(a) mandated "the arbitrator shall have the power to rule on his or her own jurisdiction," when incorporated through explicit and exclusive reference to the AAA Rules in the delegation clause, providing "clear and unmistakable" evidence of exclusive jurisdiction to the arbitrator. *Fallo*, 559 F.3d at 877 (citing R-7. Jurisdiction, AAA-ARBRLCML 03 s R-7(a))

      *Fallo* and *McAllister* are distinguishable and unpersuasive because, here, the AAA Rule 7(a) did not exist at the time the delegation clause was drafted. Unlike the *McAllister* Court, we are not similarly constrained to follow the Eighth Circuit. *A.H. by & through D'Avis v. Indep. Sch. Dist.*, 466 S.W.3d 17, 23 (Mo. App. W.D. 2015) ("While federal court decisions are not binding on this court, they are persuasive authority"). More importantly, rather than simplifying the analysis as the *McAllister* Court did, *Fallo*'s reference to *Express Scripts, Inc. v. Aegon Direct Mktg. Services, Inc.*, 516 F.3d 695, 701 (8th Cir. 2008) highlights an absence of Eighth Circuit guidance on the question before us today: how to resolve this "incorporation" argument when the arbitration jurisdictional rule supposedly referenced did not exist at the time of contract formation. *See Express Scripts, Inc.*, 516 F.3d at 701 (declining to address whether AAA Rules in effect at the time of dispute incorporates Rule 7(a)'s jurisdictional delegation of arbitrability where the AAA did not contain jurisdictional delegation at contract formation). Given the unique facts of this case, we are unpersuaded this line of federal cases informs our analysis.

10

Applying Missouri law, Appellants argue their case is similar to *Pinkerton* simply because they have an arbitration clause that incorporates the AAA Rules "in accordance with the most applicable then existing rules . . . ." However, Appellants misrepresent the plain language of the purported delegation clause from 1995, which reads: "in accordance with the most applicable then existing rules of the American Arbitration Association (or its successor or in the absence of a successor, an institution or organization offering similar services)." On the face of this contract, it does not clearly and unmistakably incorporate AAA rules on exclusive jurisdiction by reference, merely whatever rules are in use by AAA or some similar service at the time of a dispute. The jurisdictional delegation language necessary to "clearly and unmistakably" evidence a delegation of arbitrability to an arbitrator would not be present in the AAA commercial rules for nearly a decade. At the time of formation of the contract, the 1993 AAA rules in effect to which the parties referred did not affirmatively incorporate jurisdictional challenges, and did not do so until 2003.[6] When the AAA rules were revised in 1996, even one year after the formation, this jurisdictional delegation was still not present.

Simply stated, the change in the AAA rules in 2003 cannot and does not alter the parties' contractual intent in 1995, such that they "clearly and unmistakably" intended to affirmatively grant arbitrators the exclusive power to decide arbitrability when the contract was formed. The AAA Rules are not a time machine. Because AAA Rule 7(a) did not exist at the time, we conclude the Plaintiffs, the Rams, and Kroenke did not "clearly and unmistakably" enter into an antecedent agreement in 1995 to delegate to arbitrators the power to decide whether Plaintiffs'

---

[6] *See generally* AAA-ARBRLCML 96 (July 1, 1996) (lacking any mention of self-determination of arbitrability); *but see* R-7. Jurisdiction, AAA-ARBRLCML 03 s R-7(a) (July 1, 2003) ("the arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.")

claims must be arbitrated. The trial court did not err denying the arbitrator the power to decide arbitrability, given the unique factual history of this case.

Point I is denied.

**Point II**

In Point II, Appellants contend that because Plaintiffs' claims touch matters covered by the 1995 Lease and 1995 Relocation Agreement containing broad arbitration clauses, Plaintiffs' claims must be arbitrated. Appellants assert that resolving Plaintiffs' claims will require reference to the 1995 Lease and 1995 Relocation Agreement. Specifically, Appellants argue "the NFL relocation policy bars a club from relocating if doing so 'would result in a breach of the club's current stadium lease,' a provision that on its face mandates 'reference to or construction of' the lease and accordingly requires arbitration." Plaintiffs counter that none of their claims relate to the 1995 Lease or 1995 Relocation Agreement and therefore arbitration is not required.

Arbitration is solely a matter of contract. *Id*. Parties cannot be required to arbitrate a dispute they have not agreed to submit to arbitration. *Id*. The party asserting the existence of a valid and enforceable contract to arbitrate must prove that proposition. *Kohner Props., Inc. v. SPCP Group IV, LLC*, 408 S.W.3d 336, 342 (Mo. App. E.D. 2013).

"A court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010) (emphasis in original). "To satisfy itself that such agreement exists, the court must resolve any issue that calls into question the formation or applicability of the specific arbitration clause that a party seeks to have the court enforce." *Id*.

12

In determining whether the parties have contracted to arbitrate, the usual rules of state contract law and canons of contract interpretation apply. *Triarch Indus., Inc.*, 158 S.W.3d at 776. The guiding principles of contract interpretation under Missouri law is that a court will seek to ascertain the intention of the parties and to give effect to that intent. *Id*. The intent of the parties' contract is presumed to be expressed by the ordinary meaning of the contract's terms. *Id*. If the contract is unambiguous, it will be enforced according to its terms. *Id*. If ambiguous, it will be construed against the drafter. *Id*.

The trial court should order arbitration of any dispute that touches matters covered by the parties' contract. *Ruhl v. Lee's Summit Honda*, 322 S.W.3d 136, 138 (Mo. banc 2010) (quoting *Kansas City Urology, P.A. v. United Healthcare Servs.*, 261 S.W.3d 7, 12 (Mo. App. W.D. 2008)). As part of the scope analysis, the court must look to any exclusions or exceptions in the arbitration agreement. *Manfredi v. Blue Cross & Blue Shield of Kansas City*, 340 S.W.3d 126, 131 (Mo. App. W.D. 2011) (En banc). Express provisions excluding particular grievances from arbitration are enforceable. *Id*.

For a tort claim to be subject to arbitration, it must raise some issue the resolution of which requires reference to or construction of some portion of the parties' contract. *Riley v. Lucas Lofts Investors, LLC*, 412 S.W.3d 285, 291 (Mo. App. E.D. 2013). Where a tort claim is independent of the contract terms and does not require reference to the underlying contract, arbitration is not required. *Id.* The relationship between the tort claim and the contract is not satisfied simply because the dispute would not have arisen absent the existence of the contract between the parties. *Id.*

Here, Plaintiffs' claims are based on their alleged status as third-party beneficiaries to the NFL Policy and Defendants' purported noncompliance with that policy as it relates to the Rams

13

move from St. Louis to Los Angeles in 2016. The NFL Policy contains no arbitration provision, but Appellants seek to invoke arbitration provisions from the Rams' 1995 Lease and 1995 Relocation Agreement entered into when the Rams moved from the Los Angeles market to St. Louis in 1995. Appellants contend that because Plaintiffs' claims "touch matters" covered by the 1995 Lease and 1995 Relocation Agreement, arbitration is required. We disagree.

At issue is whether Plaintiffs and Appellants agreed to arbitrate the disputes raised in Plaintiffs' petition—not whether they agreed to arbitrate disputes arising out of the 1995 Lease or 1995 Relocation Agreement. We conclude that Plaintiffs and Appellants have not agreed to arbitrate the specific disputes related to the NFL Policy. In reaching this conclusion, we consider each claim.

Plaintiffs' claims concern whether Defendants complied with their obligations under the NFL Policy in relocating the Rams from St. Louis in 2016. Count I alleges breach of contract against all Defendants, specifically breach of the NFL Policy's obligation of diligence and good faith. Count II alleges unjust enrichment against all Defendants based on Defendants' alleged noncompliance with the NFL Policy. Count III alleges fraudulent misrepresentation against Appellants and count IV alleges fraudulent misrepresentation against all Defendants based on the respective parties' alleged fraudulent statements to Plaintiffs intending to induce Plaintiffs into continuing to keep the Rams in St. Louis. Count V alleges tortious interference with business expectancy against all Defendants, except the Rams, based upon the clubs' vote allowing the Rams to move from St. Louis to Los Angeles. These counts are based on the respective Defendants' alleged failure to comply with their obligations under the NFL Policy, not the 1995 Lease or 1995 Relocation Agreement. Plaintiffs' claims are independent of the 1995 Lease and 1995 Relocation Agreement evidenced by Plaintiffs maintaining the same claims against the

14

other eighty-eight Defendants. Those Defendants are not parties to the 1995 Lease and 1995 Relocation Agreement. Plaintiffs' claims against the other Defendants exist independently based on the NFL Policy, as do Plaintiffs' claims against the Appellants.

The Rams' 1995 Lease and 1995 Relocation Agreement concerned the Rams relocation in 1995. Plaintiffs have alleged no violation of the 1995 Lease or 1995 Relocation Agreement, and Plaintiffs' claims do not require reference to or construction of those contracts. The NFL Policy's prohibition on relocation if it would cause a breach of a current club's lease does not require us to interpret the 1995 Lease because the 1995 Lease was terminated and there is no issue on whether it was breached. Thus, we are not satisfied the parties agreed to arbitrate the specific disputes here. See *NutraPet Sys., LLC v. Proviera Biotech, LLC*, 542 S.W.3d 410, 415 n.9 (Mo. App. W.D. 2017) (distinguishing *Pinkerton* because there was no arbitration provision agreed to by the parties applicable to the claims arising from the promissory note at issue); *Hopwood v. CitiFinancial, Inc.*, 429 S.W.3d 425, 427-28 (Mo. App. S.D. 2014) (affirming the trial court's denial of the motion to compel arbitration because the earlier-executed arbitration agreements executed between 2003 and 2005 did not apply to respondents' claims arising from the 2006 Note). While unnecessary, a review of the arbitration provisions in the 1995 Lease and 1995 Relocation Agreement further support our conclusion.

The arbitration provision in the 1995 Lease states that "any claim arising out of, in connection with, or in relation to the interpretation, performance or breach of *this Amended Lease* (including any determination of whether the 'First Tier' or 'First Class' standard provided in Section 1.3 of Annex 1 to this Amended Lease has been met) shall be settled by arbitration . . . ." (Emphasis added). Similarly, the arbitration provision in the 1995 Relocation Agreement states that "any controversy, dispute or claim . . . related to *this Relocation Agreement*, including

15

without limitation, any claim arising out of, in connection with, or in relation to the interpretation, performance or breach of *this Relocation Agreement* shall be settled by arbitration . . . ." (Emphasis added). We find the parties' intent behind these provisions was to arbitrate any claims related "to the *interpretation, performance, or breach*" of the *1995 Lease and 1995 Relocation Agreement*. Plaintiffs' claims, however, are not related to the interpretation, performance, or breach of the 1995 Lease or 1995 Relocation Agreement. The Rams terminated the 1995 Lease before relocating to Los Angeles. Plaintiffs do not claim the Rams breached the 1995 Lease or the 1995 Relocation Agreement and do not dispute the Rams had the right to relocate under those agreements.

Plaintiffs allege that in reliance on Defendants' obligations imposed by the NFL Policy they took action to develop and finance a new stadium complex. Plaintiffs' claims relate to the interpretation, performance, and alleged breach by Defendants—not just Appellants—of the NFL Policy. There is no need to interpret the 1995 Lease and 1995 Relocation Agreement to resolve Plaintiffs' claims.

Further, the 1995 Lease explicitly excludes the City and the County from the arbitration clause. While the exclusion states that the City and the County may only sue or be sued in Federal District for the Eastern District of Missouri, this supports that the parties to the 1995 Lease did not intend for the City and County to arbitrate their claims related to the interpretation, performance, or breach of the 1995 Lease, let alone Plaintiffs' claims under the NFL Policy.

Appellants' point two is denied. Because there is no arbitration agreement applicable to Plaintiffs' claims, Appellants' points three is also denied. See *Hopwood*, 429 S.W.3d at 427 (denying appellants claim that the arbitrator must decide whether arbitration is appropriate

16

because it was wrongfully premised on a valid arbitration agreement applicable to respondents' underlying claims).

## Conclusion

For the reasons stated above, the trial court's denial of Appellants' motion to compel arbitration is affirmed.

_____
Philip M. Hess, Judge

Lisa P. Page, C.J. and
Roy L. Richter, J. concur.